KING, C.J.,
for the Court.
¶ 1. This is an appeal from a jury verdict in the Circuit Court of Copiah County in favor of the plaintiffs in a personal injury-products liability lawsuit in which a defective automobile tire was found to be responsible for the death of one man and the injury of two young men in an automobile accident in 2000. The appeal is brought by the maker of the tire, The Goodyear Tire & Rubber Company (Goodyear) and the company which installed the tire, Big 10 Tire Company (Big Ten). Howard Wilson Chrysler-Jeep, Inc., the dealership *287 which sold the automobile to the decedent, Nicholas Kirby, Jr., and his mother, was originally a defendant, but settled with the plaintiffs for $495,000 and is not a party to this appeal. (The settlement gave Riley Strickland $50,000, the estate of Kirby $250,000 and Sidney Odom, $230,000.) Following a two-week trial in late October and early November, 2006, the jury returned a verdict awarding damages of $733,333.40 to the estate of Kirby, $117,963 to Strickland, a passenger in the car, and more than $1.7 million to a third passenger in the car, Odom. The judge deducted the settlement amounts from former defendant Howard Wilson and entered a final judgment against Goodyear and Big Ten in favor of the estate of Kirby in the amount of $518,333, to Strickland in the amount of $67,963.34 and to Odom in the amount of $1,524,800 for a total verdict against the defendants of more than $2.1 million.
¶2. Following the denial of the defendant’s post-trial motions, Goodyear and Big Ten filed their appeal arguing the following assignments of error:
I. Plaintiffs Failed to Present Any Evidence of a Manufacturing Defect
II. The Jury Had Insufficient Evidence of Any Breach of Warranty
III. Irrelevant and Prejudicial Evidence Was Improperly Presented to the Jury
IV. It Was Reversible Error for the Trial Court to Disregard the Mandatory Language of Mississippi Code Annotated section 85-5-7
V. Misconduct Regarding the Jury Foreperson Requires a New Trial
VI. The Jury Was Inflamed and Prejudiced by Improper Remarks of Plaintiffs Counsel -
VII. Whether Cumulative Error Requires a New Trial
VIII. Whether the Trial Court Erred in Denying Defendant’s Motion for Remittitur
¶ 3. The Kirby plaintiffs[1] filed a cross-appeal setting out the following assignments of error:
I. The Trial Court Erred in Dismissing Plaintiffs’ Breach of Implied Warranty Claims
II. The Trial Court Erred in Dismissing Plaintiffs Design Defect Claim
III. The Trial Court Erred in Failing to Compel Defendants to Make Discovery
¶ 4. Finding no error, we affirm on direct appeal and dismiss the cross-appeal as moot.
FACTS
¶ 5. Three young men, all of whom were under the legal age and intoxicated, were driving a 1998 Chevrolet Camaro Z28 at speeds from 88-92 miles per hour during the early morning hours of August 5, 2000, in rural Copiah County. The owner and driver of the automobile was Travis Kirby, age 20, and with him were his two friends, Strickland, age 18 who was in the front passenger seat, and Odom, age 19, who was in the back seat. At approximately 3:00 a.m., the automobile left the road, rolled, clipped a tree, continued to roll hitting another tree, and then came to rest on its side against a tree. The accident, which occurred between Crystal Springs and Hopewell, on Mississippi Highway 27, was not discovered until about dawn when a passing motorist, Sandy Adams, saw a *288 piece of tire tread and some gravel on the side of the road. He stopped, spotted the car lying on its side against a pine tree, and began to render aid. He found one young man, later identified as Strickland, conscious sitting up against a tree to the left of the car and another young man, later identified as Odom, nearby but unconscious lying face down on the ground. Adams called the sheriffs department. Adams said that Strickland kept saying, “Where’s Travis? We need to find Travis,” so he started to look for a third person and found Kirby covered up in a brush pile. When he checked Kirby’s pulse, he found he was dead.
¶ 6. According to Mississippi Highway Patrol investigator Cecelia Kazery, who investigated the accident the same day but after the passengers had been removed from the scene, there was no evidence of braking. There were scuff marks from the tire tread making contact with the asphalt, according to her report. The report said that the Z28 rotated counterclockwise and slid sideways until the rear bumper made contact with a tree. The automobile continued rotating and hit a second tree; it then hit several small trees and finally one large tree before coming to rest on its side. All seat belts appeared to be unused, and all three passengers were ejected from the car. She noted that when she arrived at the wreck scene, she smelled alcohol and saw Bud Light beer containers inside and outside the accident vehicle.
¶ 7. Strickland testified that Kirby had bought a case of beer and that all three occupants were drinking before the accident, although he said Kirby drank most of it. Blood-alcohol tests were obtained and showed that Kirby’s blood-alcohol level was .25, more than three times the legal limit. Strickland’s blood-alcohol level was .103 when tested four and a half hours after the accident. Odom testified that he also had been drinking. Odom said that he got into the car with Kirby and Strickland that night after they asked him and a group of others, “Who wants to go to the Beacon?” Strickland testified that some time after midnight they went to the Beacon, a bar in Terry, Mississippi. Kirby went inside for about forty minutes while Strickland and Odom stayed in the car, listened to the radio, and drank beer. Strickland said that when Kirby came out of the bar, Strickland took the wheel; Kirby was the passenger, and Odom had gone to sleep on the back seat. Later, after they stopped for a bathroom break, Kirby took the wheel; Strickland got in the front passenger seat, and Odom was asleep on the back seat.
¶ 8. Kirby was killed in the accident. Strickland testified that he did not remember what occurred in the accident. Odom testified that he was asleep on the back seat when the accident happened, so he did not remember anything about the crash. Thus, the cause of the wreck was the crux of the trial.
¶ 9. The Kirby plaintiffs contend that the cause of the accident was a faulty right back tire manufactured by Goodyear and sold by Big Ten which without provocation threw off pieces of tread causing the tire to rapidly deflate and the car to lose control and crash. Goodyear and Big Ten claim the accident was caused by the excessive speed at which the car was traveling, by the drunken condition of the driver Kirby, and by a puncture in the tire caused by impact damage after running over something that cut the surface of the tire.
¶ 10. Testimony showed that Kirby and his mother, Shirley, bought the red Z28 Camaro from Howard Wilson at a tent sale at the coliseum in Jackson on May 13, 2000. The former owner was Ivan Ostran-der, and it was Ostrander who had the *289 tires in question put on the car. On April 26, 2000, Ostrander took the car to the Big 10 in Hattiesburg, Mississippi for replacement tires. The Big Ten salesman who sold Ostrander the tires testified that he quoted Ostrander the price of the high performance Z tire, which came on the car, and the price of the S performance tire, which he testified was an acceptable substitute tire for the Z tire. The salesman said he explained the difference between the tires and tried to sell Ostrander the Z tires, but Ostrander “flatly refused” to pay for the high performance Z tires, which cost about twice as much as the acceptable performance S tire. The salesman acknowledged that he had seen a 1995 product-information bulletin that Goodyear sent out to its retailers regarding selection and application of speed-rated tires.[2] The bulletin provided, in part, that:
If the vehicle manufacturer specifies speed rated tires, the replacement tires must have a speed rating of equal or higher value to maintain the vehicle speed capability. If replacement tires are selected by the customer that have a lower speed rating than specified by the vehicle manufacturer, or if non-speed rated tires are selected by the customer where speed rated tires are specified, the customer must be advised and informed of such changes in speed ratings, and the vehicle speed capability will be limited by the non-speed rated tire(s) or by the tire(s) with the lowest speed rating.
(Emphasis added). The salesman said it was his usual practice to inform the customer about the difference in the performance of the tires when a lesser speed-rated tire was selected by the customer, although he could not specifically recall that he did so with Ostrander.
¶ 11. The Kirby plaintiffs’ tire expert was Robert Ochs who testified that after the accident he examined and tested all four tires[3] that were on the Kirby automobile. He said he sent the three intact tires, which had not failed, to an independent laboratory where a shearographic inspection showed that two of the three tires (the right front and the left rear) had small separations located between the belts. The right-rear tire was not sent to the lab because it had already come apart and was in pieces. Ochs testified that a shearographic inspection detects internal separations in the tire not visible from the outside. According to Ochs, this inspection would indicate the “health” of the tires not involved in the accident. Ochs testified that such separations or cracks in the structure of the tire at one of the tire’s high stress locations' could lead to a tread split or separation of the tread of the upper belt from the tire structure.
¶ 12. Ochs testified that the tire tread on the right-rear tire separated because of the speed at which the car was being operated, causing chunks of rubber to break away from the shoulder of the tire and finally resulted in the tread-belt detachment. Ochs testified that the speed rating on the tire was 112 miles an hour *290 and that Kirby was traveling at the rate of between 88 and 92 miles per hour. He explained that a speed rating is given by the manufacturer after “tests are run ... so that the consumers can get some sort of ranking of what speed capabilities the tire has.” He said the rating represents at what speed a given tire can be operated for a sustained period of time under appropriate load conditions with the appropriate inflating pressure. Ochs testified that the tire wear showed that the tire, which failed, had been properly inflated. In fact, an employee of a Clinton oil change establishment testified that he had serviced the car the day before the accident and noted that the tires were properly inflated.
¶ 13. In contrast, Goodyear’s tire analyst, James D. Gardner, testified that his examination of the right-rear tire showed that the disintegration of the tire was caused by a puncture, and he showed the jury a cut and gouge on the upper side of the shoulder of the tire. Gardner said that there was a radial split and broken cords right beside the cut, which he said was “very clear” evidence that the tire came apart due to an impact with an object. He rejected the idea that the tire could have split when it ran off the road because he did not note any significant damage to the tire rim, which would have sustained damage if the tire was already deflated. Gardner said that the tire did not necessarily start leaking air after hitting the object and estimated that the car could have run over the object and sustained the damage as much as 100 miles away from the accident site. He said that the melted and fused cord, which he found inside, the tire indicated that the tire was losing air pressure as the car was going down the road. Gardner said it was not uncommon for the owner of a tire that has a puncture or impact damage not to know what the obstacle was that was hit and caused the damage to the tire. He said the most common example of such a road hazard is when a driver runs over a nail. Gardner said that he did not perform a shearo-graphic examination of the tire because the equipment is very sophisticated, and in order to interpret the data it produces, one must have a baseline. That is, an examiner must be able to see what the tire looked like when it was new, which he said was impossible in this case. He testified that the damage to the tire would not have been as great if Kirby had been going the posted speed limit of 55 miles per hour, as opposed to traveling at 92 miles per hour. Gardner said that this was because the centrifugal force — the force that tends to make everything move away from the center of a spinning object — would not have been as great if Kirby had been driving slower, and the tire would not have been spinning as quickly to cause the separation. On cross-examination, Gardner admitted that he could not tell the jury what the object was that the tire hit, nor could he testify as to when the car ran over the object.
¶ 14. The Kirby plaintiffs’ accident re-constructionist, Gilbert L. Rhoades, testified that the road was straight and level where the accident occurred. He opined that the cause of the wreck was a catastrophic failure of the right-rear tire, which caused the tire to rapidly lose air pressure. He said that with the loss of air pressure, the tire would no longer track the wheel rim and that resulted in the driver having no control over the car because the steering mechanism is affixed to the front tires. He said that after the tire’s failure, the back of the car dropped and had no lateral or side-wise stability, causing the car to run off the right side of the roadway and begin to rotate clockwise. The automobile traveled 481 feet after it left the road, glancing one tree as it tumbled and ultimately hitting a tree where it *291 came to rest on its side. It was Rhoades’s opinion that neither alcohol nor speed contributed to the accident.
¶ 15. Goodyear’s accident reconstructionist, James J. Hannah, testified that the accident could have been a controllable situation, but it was not because Kirby’s excessive speed and his alcohol impairment caused him to be unable to maneuver to control the vehicle. According to Hannah, under conditions as occurred during the wreck, the driver would receive some kind of sensation that the right-rear tire was not rotating correctly, and the car would move to the right. He said this would cause an unimpaired driver to take action to steer to the left to keep the car from going off the roadway. Hannah said he surveyed the terrain where the accident occurred and offered his opinion that if Kirby had been driving within the speed limit when the tire event occurred, he could have steered left and kept the vehicle under control as there was adequate shouldering beside the road to support a controlling movement. Hannah testified that even going 92 miles per hour, Kirby would have heard and felt the tire slapping up against the car, hitting it so hard that he would have had an indication that something was happening and could have steered to the left in an attempt to control the vehicle. Hannah said he saw nothing to indicate that any action was taken by Kirby to control the car, which Hannah attributed to Kirby’s excessive alcohol impairment.
¶ 16. The trial court granted Goodyear’s motion for a directed verdict on the Kirby plaintiffs’ tire design defect claim. The court said that there was no causation proven for a design defect claim. Further the court found that there was no evidence that Big 10 was negligent by placing the S-rated tire on the automobile instead of the Z-rated tire, which came on the Camaro.[4] The judge said he based his decision on the fact that while the Z tire was rated to run at speeds upwards of 150 miles per hour, the S-rated tire that Big 10 placed on the vehicle was rated to run at speeds up to 112 miles per hour, and the car involved in the accident was going between 88 and 92 miles per hour, well within the S tire’s rating of 112 miles per hour. The court said that there was no evidence presented that it was illegal or negligent to put the lesser-rated S tire on the Z28, as the expert testimony showed that the tire was a correct size for the car. Thus, the court said that there was no causation proved for a design defect claim.
¶ 17. However, the court did allow the jury to consider the claims based upon the theory of Goodyear’s failure to comply with an express warranty and the tires’ failure to perform according to express factual representations: specifically that the 50,000-mile-warranted tire, having only 10,000 miles of use, would perform safely at speeds up to 112 miles per hour.
¶ 18. The court overruled Goodyear’s motion for a directed verdict, and the case went to the jury after a five-day trial. The jury deliberated for a day and a half ultimately rendering verdicts in favor of the Kirby plaintiffs. Goodyear’s post-trial motions were denied following a lengthy hear *292 ing. From the verdict and the denial of its post-trial motions, Goodyear appeals.
ANALYSIS
I. THE KIRBY PLAINTIFFS FAILED TO PRESENT ANY EVIDENCE OF A MANUFACTURING DEFECT.
¶ 19. Goodyear argues that the Kirby plaintiffs failed to prove that there was a manufacturing defect in the tire when it left the control of the manufacturer, Goodyear, or the seller, Big Ten. Goodyear claims that the Kirby plaintiffs failed to show any actual deviation in the tire from the manufacturer’s specifications. Therefore, under Mississippi products liability statute, Goodyear argues that a judgment notwithstanding the verdict was proper and the jury’s verdict should be reversed and rendered for Goodyear.
¶ 20. The standard of review for a denial of a judgment notwithstanding the verdict is well settled. In reviewing such a denial this Court will consider the evidence in the light most favorable to the non-moving party (the Kirby plaintiffs), giving them the benefit of all favorable inferences that may be reasonably drawn from the evidence. 3M Co. v. Johnson, 895 So.2d 151, 160 (¶ 30) (Miss.2005) (quoting Munford, Inc. v. Fleming, 597 So.2d 1282, 1284 (Miss.1992)). If the facts so considered point so overwhelmingly in favor of the moving party, Goodyear, that reasonable jurors could not have arrived at a contrary verdict, then we are required to reverse and render. Id. However, if there is substantial evidence to support the verdict, that is, “evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions,” we must affirm. Id.
¶ 21. As the trial progressed, the trial court winnowed down considerably the claims against Goodyear and Big 10. The court directed a verdict in favor of the defendants on the plaintiffs’ design defect claim. Further, the judge granted a directed verdict as to plaintiffs’ claim of negligence against Big 10, finding that the testimony showed that the S tire was an acceptable alternative to the Z tire which came on the car. Also the judge threw out the Kirby plaintiffs’ claim against Big 10 that it should have warned the purchaser of the tires that he could not run the automobile on the S tires like he could on the Z tires.
¶ 22. Prior to Goodyear calling its final witness, tire expert Gardner, the trial judge with the jury out, restated what theories would and would not be going to the jury. He said that there was “simply no evidence” before the court on the Kirby plaintiffs’ design defect claim which could be submitted to the jury. He said there was some testimony in the Beale Robinson deposition about the tread-throw problem in other vehicles and how Goodyear looked into the problem including all of its vehicles. But he found there was not enough evidence to go to the jury on a design defect theory. He then reminded the attorneys for Goodyear that the defense should not have to cover the design defect theory with its final witness as the court had previously directed a verdict on the issue, and he intended to submit a jury instruction to that effect. The trial court announced that he was allowing the case to go to the jury on a single theory — breach of an express warranty — whether the tires failed to perform to Goodyear’s expressed representations that the tires would perform at a speed of up to 112 miles per hour for a useful life of 50,000 miles, and that the tire with only 10,000 miles on it had a sudden catastrophic failure.
*293 ¶ 23. The trial judge said there was “very strong expert testimony” by the Kirby plaintiffs’ expert Ochs about the separation of the tire’s belts followed by the contact with the road and how the tire deteriorated through the different stages. Further the court said that there was testimony that the tire was checked the day before the accident and was found to be properly inflated and to be without problems. He reaffirmed the reasons he gave for denying Goodyear’s directed verdict motion. Those reasons being that the testimony for the plaintiffs showed that: (1) without warning the right-rear Goodyear tire catastrophically failed within a short time frame, deflated, and the tread came off; (2) the failure was caused by a belt separation within the tire; that the tires only had 10,000 miles on them and that they were warranted to be 50,000 mile tires; (3) the right-rear tire failed to safely perform for the purpose for which it was intended; (4) the car was being driven on a straight road at 92 miles per hour within the tires’ rating of 112 miles per hour; and (5) a reasonable jury could find that the tire failed to safely perform as it was expressly warranted to and that the defective and unreasonably dangerous condition of the tire was a proximate, contributing cause of the accident and the resulting death and injuries.
¶ 24. Thus, it is clear to this Court that the theory on which the case went to the jury was not that of a manufacturing-defect theory, but instead it was that the tire beached an express warranty or failed to conform to other express factual representations upon which Kirby justifiably relied in using the product pursuant to Mississippi Code Annotated section 11—1—63(a)(i)(4) (Rev.2002).
¶ 25. Therefore, we find no merit to this assignment of error.
II. THE JURY HAD INSUFFICIENT EVIDENCE OF ANY BREACH OF WARRANTY.
¶ 26. The argument on this alleged error somewhat overlaps the discussion of Issue I. Goodyear argues that there is no evidence to support a finding that a warranty existed between Goodyear and the Kirby plaintiffs. Specifically, Goodyear claims that jury Instruction No. 7 allowed the jury to find against the defendants even if there was no defect in the tire, simply based on the fact that the tire failed. In other words, Goodyear argues that there was no record evidence to support any warranty’s existence so the instruction assumed facts not in evidence.
¶ 27. Jury Instruction No. 7 reads in full:
You are instructed that a manufacturer or seller of a product is liable for damages caused by that product, other than commercial damages to the product itself, if you find from a preponderance of the evidence:
1. That Kelly Springfield/Goodyear Tire & Rubber Co. was in the business of selling automobile tires and did in fact sell a Charger SR tire; and
2. That at the .time the Charger SR tire left the control of Kelly Springfield/Goodyear Tire & Rubber Co., the defendant represented that the tire would be safe at speeds up to 112 miles per hour for 50,000 miles and that the defendants’ claims amounted to an express warranty or other express factual representation upon which the purchaser relied in selecting the use of the Charger SR tire; and
3. That the warranty or other expressed factual representation was breached or false, which made the product defective; and
*294 4. The defective condition rendered the product unreasonably dangerous to the user or consumer; and
5. The defective and unreasonable and dangerous condition of the product was the proximate cause of the plaintiffs’ damages;
then your verdict shall be for the plaintiff.
However, if the plaintiff has failed to prove any of these elements by a preponderance of the evidence in this case, then your verdict shall be for the defendant.
¶ 28. The Kirby plaintiffs argue that Goodyear failed to preserve the issue of jury Instruction No. 7 for appeal. “To preserve an objection to a jury instruction, the specific ground for the objection must be stated in the original objection. The issue raised on appeal may not be based on a different legal theory.” Fitch v. Valentine, 959 So.2d 1012, 1023 (¶ 28) (Miss.2007).
¶ 29. The Kirby plaintiffs point out that when the instruction was submitted, the trial judge said that he was granting the instruction since it appeared to be a proper statement of the Kirby plaintiffs’ theory of the case. The court then asked the defendants’ attorneys for objections to the instruction. The Kirby plaintiffs argue that Goodyear failed to state specific grounds for objection to Instruction No. 7 instead making only generalized objections which failed to put the instruction at issue on appeal.
¶ 30. The following statements were made after the trial judge said he was allowing Instruction No. 7 as a correct statement of the plaintiffs’ theory of the case:
BY MR. BAXTER [attorney for Goodyear]: Your Honor, this, I don’t think, is proper but to give an instruction here where there clearly has been evidence submitted and the jury could conclude that this tire failed within the warranty mileage for some reason other than a manufacturing defect.
BY MR. NORTON [attorney for Big 10]: Your Honor, I think that the warranty information specifically says that it does not apply if there’s been misuse or abuse of this tire, and that’s our theory of the case is that there—
BY THE COURT: And also there’s testimony about whether or not the condition as it left the factory or the seller, and all instructions are to be read together, and I’m going to fully allow that. Those objections, the Court will grant this over those objections.
MR. BAXTER: One other objection, Your Honor, is that the warranty doesn’t apply to either the driver nor the occupants because the limited warranty was limited to the original purchaser of the tires expressly stated in the documents—
MR. ALLRED [attorney for plaintiff Odom]: Your honor, there’s a statute in Mississippi that says that’s not so. Privity is not a defense under the warranty claim in Mississippi by statute.
BY THE COURT: This is going to be granted over those objections.
¶ 31. The record clearly shows that the defendants did not specifically object to the instruction on the basis that there was no express warranty guaranteeing that the S tires would not fail at less than 50,000 miles or at speeds of 112 miles per hour or below. Nor did the defendants’ stated objections mention the S tire’s speed rating or representations made to the purchaser of the tire. Instead, what is stated by the defendants are generalized objections. Therefore, we find that Goodyear has failed to preserve this issue for appeal since it failed to object to *295 the instruction upon the specific ground it is now raising on appeal. Fitch, 959 So.2d at 1023 (¶ 28) (citing Shields v. Easterling, 676 So.2d 293, 296 (Miss.1996) (“Shields did not put this objection to the trial court in any specific meaningful manner. Thus, the trial judge had no opportunity to rule on it.... Thus, this Court is barred from reviewing this issue.”)).
¶ 32. We find this argument to be procedurally barred as Goodyear did not put its objection to Instruction No. 7 in “any specific meaningful manner” that gave the trial judge an opportunity to rule on the objection and instead is trying to use the instruction now to bootstrap its argument that there was insufficient evidence for a breach-of-warranty instruction.
¶ 33. However, procedural bar notwithstanding, we conclude that the trial court properly exercised its discretion in allowing Instruction No. 7, and further we find the trial court was correct in allowing the case to go to the jury on a breach-of-warranty theory.
¶ 34. Ochs, the plaintiffs’ tire expert, testified that the .S tire at issue should sustain an automobile at speeds up to 112 miles per hour due to the maximum speed rating of the S tire. Ochs testified that the United .States government issues standardized procedures widely held reliable about the performance of both the S tire and the Z tire. “The S-rating when stamped on the tire indicates that the tire will perform at 112 miles an hour. The Z indicates that it will perform at 150 miles per hour or higher,” Ochs stated. The expert testified that he based his opinion about the tire’s performance on reading the deposition of Goodyear regarding the tire and reading advertisements for the S tire and said that the warranty for the tire as represented by Goodyear was for 50,000 miles at a speed rating of 112 miles per hour. Thus, considering this testimony, we find that there was sufficient evidence in the record to warrant the trial court allowing the jury to consider the case based upon a breach-of-warranty claim.
¶ 35. We make this finding after observing that Goodyear was granted six jury instructions directly pertaining to Instruction No. 7. Specifically, Goodyear was granted Instruction No. 32 which defined a “defective” product and reads in full:
The Court instructs the Jury that the term “defective” as used in these instructions is defined as the failure of a product to meet the reasonable expectations of the ordinary consumer of that product as to safety. A product can be deemed to be in a defective condition only if the plaintiffs prove by a preponderance of the credible evidence that the product was, at the time it left the manufacturer, in a condition not contemplated by the ordinary consumer of that product, and which would be unreasonably dangerous to them or to their property.
Defendants’ Instruction No. 33 set out the elements that must be found in order to find for the plaintiffs and reads as follows:
The Court instructs the Jury that before the plaintiffs may recover a verdict in this case against defendant, The Goodyear Tire & Rubber Company, he must first prove by a preponderance of the credible evidence each and every one of the following elements:
1. That the tire in question was in a defective condition when it left the control of defendant, The Goodyear Tire & Rubber Company; that is that [it] did not function as expected when utilized for its intended purpose;
2. That such defect, if any, made the tire unreasonably dangerous for its intended purpose;
*296 3. That the tire was expected to and did in fact reach the plaintiff, Travis Kirby, without substantial change in the condition in which the tire was manufactured by defendant, The Goodyear Tire & Rubber Company; and
4. That the allegedly defective condition of the tire in question was the proximate cause or a proximate contributing cause of plaintiffs injuries and damages.
The Court further instructs the Jury that if plaintiffs fail to prove any one of the above listed elements by a preponderance of the credible evidence in this case, it will be your sworn duty to return a verdict for the defendant, The Goodyear Tire & Rubber Company.
Defendant’s Instruction No. 34 provides as follows:
The Court instructs the Jury that the defendant, The Goodyear Tire & Rubber Company, had no duty to distribute or manufacture a tire which was totally accident proof or that would not fail under any circumstances. The Court further instructs the Jury that the defendant, The Goodyear Tire & Rubber Company, is not an insurer against the possibly of an accident or injury arising out of the use of its product, nor is it the guarantor of the driving of the plaintiffs. The duty of the defendant, The Goodyear Tire & Rubber Company, was to manufacturer a tire that was safe when maintained and used in the proper manner for which it was intended.
The fact that the accident occurred and that the plaintiff sustained injuries constitutes no evidence whatsoever that the tire was defective or unsafe and raises no presumption that the accident was due to any failure by the defendant, The Goodyear Tire & Rubber Company.
In defendants’ Instruction No. 35 the jury was told:
The Court instructs the Jury that in order to recover from this defendant, The Goodyear Tire & Rubber Company, one of the elements which the plaintiffs must prove by a preponderance of the evidence is that the tire in question on the date of the accident was in substantially the same condition as it was in when it was manufactured by the defendant, The Goodyear Tire & Rubber Company.
In making this determination, the following factors may be considered:
(A) previous punctures, if any, sustained to the tire after it left the control of defendant, The Goodyear Tire & Rubber Company, but before plaintiffs’ accident;
(C) [sic] the number of previous owners of the tire and the manner in which the previous owners drove the tire;
(D) the approximate number of miles the tire had been driven;
(E) the amount of tread remaining on the tire as of the date of the accident;
(G) [sic] whether the tire sustained impact damage.
Therefore, if you find by a preponderance of the evidence that by the time this accident occurred there had been a substantial change other than ordinary wear and tear in the condition of the tire from the condition it was in at the time of the tire’s manufacture, then it is your sworn duty to return a verdict for the defendant, The Goodyear Tire & Rubber Company.
Defendants’ Instruction No. 36 addressed Kirby’s exercise of reasonable care and states:
*297 The Court instructs the Jury that the plaintiffs are not entitled to recover damages for such harm as could have been avoided by Travis Kirby, deceased, had he been exercising reasonable care for his own safety, or harm that resulted from Travis Kirby’s own lack of care. The Court, therefore, instructs the Jury that if you find from a preponderance of the evidence that Travis Kirby failed to exercise reasonable care for his own safety on August 5, 2000, while driving on Highway 27, and you further find such negligence, if any, on the part of Travis Kirby constitutes the sole proximate cause of the accident in question, then it will be your sworn duty as Jurors to return a verdict for the defendant, The Goodyear Tire & Rubber Company.
And in defendants’ Instruction No. 40 the jury was instructed what it should do if it found that the tire failed due to a road hazard and not due to a manufacturing defect. That instruction states the following:
The Court instructs this jury that the Defendants contend the tire in question failed due to impact damage from a road hazard object and not due to any manufacturing defect. If you find by a preponderance of the evidence that the tire in question failed due to impact damage and was not defectively manufactured, then it will be you [sic] sworn duty as jurors to return a verdict in favor of the Defendants.
¶ 36. When reviewing a challenge to a jury instruction, we apply our well-stated standard of appellate review that the instructions are to be read together as a whole, with no one instruction to be read alone or taken out of context. Beckwith v. Shah, 964 So.2d 552, 554 (¶ 3) (Miss.Ct.App.2007) (quoting Howell v. State, 860 So.2d 704, 761 (¶ 203) (Miss.2003)). Further, a defendant is entitled to have the court give instructions that set out his theory of the case. Id. However, the trial judge may properly refuse an instruction if he finds it incorrectly states the law, repeats a theory fairly covered in another instruction, or is without proper foundation in the evidence of the case. Id.
¶ 37. When we review Instruction No. 7, not in isolation but as part of all of the instructions given to the jury, we find the trial court did not abuse its discretion in allowing Instruction No. 7 to be given, and further we find that the trial court did not err in allowing plaintiffs’ theory of breach of warranty to go to the jury.
¶ 38. This issue is without merit.
III. IRRELEVANT AND PREJUDICIAL EVIDENCE WAS IMPROPERLY PRESENTED TO THE JURY.
¶ 39. In this assignment of error Goodyear argues that the Kirby plaintiffs were allowed to introduce two pieces of evidence regarding Goodyear’s testing of light truck tires which it claims were irrelevant and prejudicial. First, Goodyear asserts that it was error for the trial court to allow the Kirby plaintiffs to read to the jury portions of a deposition of one of Goodyear’s former engineers, Beale Robinson, which was taken in a different lawsuit. Second, Goodyear claims it was error for the trial court to allow into evidence a one-page document entitled “Problem Summary.” The document was an exhibit to Robinson’s deposition, and Goodyear claims that the items mentioned in the summary referenced testing of light truck tires and not passenger tires like the ones Kirby drove; thus, the document was irrelevant and potentially prejudicial.
¶ 40. Our standard of review regarding admission of evidence is abuse of discretion. O’Hara v. Robinson, 904 So.2d 1110, 1111 (¶ 7) (Miss.Ct.App.2004) (citing *298 Floyd v. City of Crystal Springs, 749 So.2d 110, 113 (¶ 12) (Miss.1999)). The appellate court will only reverse the decision of the trial judge when the error adversely affects a substantial right of a party. Id.
¶ 41. Relevant evidence has been described by our rules of evidence as any evidence “having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” M.R.E. 401. Evidence, though relevant, may be excluded “if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading of the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.” M.R.E. 403. However, if the evidence has any probative value at all, then the evidence rules favor a broad interpretation that would allow for the evidence’s admission. Redhead v. Entergy Mississippi, Inc., 828 So.2d 801, 807 (¶ 16) (Miss.Ct.App.2001) (citing Williams v. State, 543 So.2d 665, 667 (Miss.1989)). “[T]he determination of the relevancy of evidence is left to the sound discretion of the trial judge[,] whose determination will not be reversed in the absence of clear abuse.” Watts v. State, 635 So.2d 1364, 1367 (Miss.1994). For a case to be reversed on the admission or exclusion of evidence, the ruling must result in prejudice and harm or adversely affect a party’s substantial right. Terrain Enters., Inc. v. Mockbee, 654 So.2d 1122, 1131 (Miss.1995).
¶ 42. To decide this issue, we first must review the contentious discovery battle fought by the parties and the actions that the trial court took on the eve of trial to bring about a legally viable truce. The Kirby plaintiffs filed three motions to compel discovery after alleging that they received very little in the way of meaningful discovery documents. At the hearing on one of the motions to compel, plaintiff Odom’s attorney, Michael Allred, told the court that he had learned from attorneys in other states that there was expert testimony in other cases against Goodyear regarding Goodyear’s research into tire-tread failure in its entire product line. He told the trial court that Goodyear had found a defective inner liner in the tire at issue and other tires and that Robinson in his deposition testified that Goodyear had to thicken and strengthen part of the tire as a corrective measure. The attorney for Goodyear, Michael Baxter, told the trial court that the Robinson deposition was taken in another case. The parties at the motion to compel hearing identified the case as Frankl v. Goodyear, a 2000 case in the Superior Court of New Jersey, which Baxter said dealt with claims from Saudi Arabia regarding Goodyear load range E truck tires. However, the Robinson deposition was in fact taken in Garcia v. Kelly-Springfield Tire Co., No. 99-1661-CIV-T-17B (M.D.Fla.1999). Baxter argued that the deposition was irrelevant since the tire involved in what he called the Frankl case was a completely different tire. Goodyear had not produced testimony from or even answered in discovery that there was an expert named Robinson who had testified about tire-tread failure. As an example of other discovery battles, Allred told the trial court that Goodyear had answered discovery saying that it did not have to answer for Kelly Tires because Goodyear is not Kelly. Baxter admitted to the trial judge that that was a mistake and that Kelly was a stand alone subsidiary which merged into Goodyear. He told the trial court that he had corrected the interrogatory answer.
¶ 43. After hearing the discovery problems and knowing that the trial was only days away, the trial judge ordered Good *299 year to produce a complete copy of the Robinson deposition to the Kirby plaintiffs, who were ordered to keep the deposition under seal. The trial court also ordered that Goodyear produce five additional depositions or testimony of Goodyear personnel in other cases to be selected by the Kirby plaintiffs. This was done on August 30, 2006, and the trial was set for October 2006.
¶ 44. Portions of Robinson’s deposition comprised the first witness for the plaintiffs. Prior to the plaintiffs’ attorney reading the selected portions of the deposition, the trial court noted that the defendants reserved their objections as to admissibility and relevancy. The defendants’ attorney was also allowed to read to the jury from the deposition. While the bulk of Robinson’s deposition was about load range E tires which are light-duty truck tires, Robinson also testified that he had experience with passenger tires as a chief engineer for Goodyear. In 1995 he said Goodyear restructured its development department and put passenger tire design in which he worked and light truck tire design into one department. He said that he was on a tread-throw committee from 1996 until 2001 that was primarily looking at problems with light truck tires, but he said that he had seen tread-throw problems in other tires as tread separation had always been a concern of Goodyear.
¶ 45. The other evidence to which Goodyear objected was a document styled “Problem Summary.” The original document, which the Kirby plaintiffs tried to introduce, consisted of six pages and was an exhibit to Robinson’s deposition testimony. The trial court only allowed the first page to be introduced into evidence and marked the other five pages for identification only. The judge further ordered language redacted on the single-page summary that referred to other litigation. In allowing the document into evidence, the trial court enunciated what he had heard from the Robinson deposition, and then the court ruled that the one-page document was only a summary of some of the things he heard Robinson testify to.
¶ 46. After reviewing the Robinson deposition and the single-page summary, we cannot find that the trial judge abused his discretion in allowing the documents into evidence. He took care to allow only those portions of the single-page summary document about which he had heard testimony. He took out five of the six pages and then removed language about other litigation that could have confused the jury from the one-page document. While the deposition was taken in another case, the deponent Robinson testified about a tread-throw problem Goodyear was experiencing. We find that the deposition dealt with a fact of consequence — the problem of tire tread throw— and tended to make the proof of the tread-throw problem more probable, thus satisfying the definition of relevant evidence. Further we find that the introduction of the Robinson deposition and summary were in the nature of a sanction on Goodyear for its failure to fully participate and cooperate in discovery. With the trial only weeks away, one of the plaintiffs’ attorneys told the trial court that he had learned from attorneys in other states that there was expert testimony about the tread-throw issue involving Goodyear and that Goodyear had not submitted such potential evidence in discovery. To remedy this situation the trial judge exercised his discretion and allowed the deposition and summary sheet into evidence.[5]
*300 ¶ 47. This assignment of error is without merit.
IV. IT WAS REVERSIBLE ERROR FOR THE TRIAL COURT TO DISREGARD THE MANDATORY LANGUAGE OF MISSISSIPPI CODE ANNOTATED SECTION 85-5-7.
¶ 48. In this assignment of error, Goodyear argues that the trial court erred by not giving the jury an instruction which it had submitted regarding the form of the verdict. Goodyear argues that because of this alleged error, it was forced to pay more in damages than it was allocated in fault.
¶ 49. Goodyear claims that the jury’s verdicts were a violation of Mississippi Code Annotated section 85-5-7(7) (Rev. 1999), which states, “In actions involving joint tort-feasors, the trier of fact shall determine the percentage of fault for each party alleged to be at fault.”[6]
¶ 50. Goodyear offered a special interrogatory verdict form that consisted of five pages and seven interrogatory questions which it claims would have properly instructed the jury on how to allocate fault, if so found. The judge refused the instruction and told the parties that he had written his own instruction for each plaintiff. Goodyear objected to the court’s instructions as did the plaintiffs. After somewhat lengthy arguments at the end of the day, the trial court instructed the parties to come up with a new instruction regarding the form of the verdict and submit it when the trial resumed. The following morning, the judge announced that he had rewritten his form of the verdict instruction. He proposed three instructions, one for each plaintiff, that dealt with the assessment of any comparative negligence against that plaintiff. He said that he used the model jury instruction form book on comparative negligence in writing the instructions. The judge explained that the instructions allowed the jury to consider any comparative negligence by the three plaintiffs, and if the jury found negligence by any one of the plaintiffs, the instruction showed the jury how to reduce the damages. The judge gave the defendants’ Instruction No. 4, a general apportionment instruction. The instruction provides:
The Court instructs the Jury that if you find from a preponderance of the evidence in this case that the defendant, The Goodyear Tire & Rubber Company, manufactured a defective tire and that such action, if any, proximately contributed to the happening of the accident in this case and to the injuries, if any, *301 which the plaintiffs sustained, then you must, in arriving at your verdict, reduce plaintiffs’ damages, if any, by that percentage which plaintiffs’ own negligence, if any, proximately contributed to the happening of the accident and the injuries, if any, sustained by them.
¶ 51. The jury also received three additional instructions on apportionment of damages, one for each plaintiff. Instruction No. 41 was for the heirs of Kirby and provides:
On the claim of the heirs of Travis C. Kirby against the defendants, Big 10 Tire Company and Goodyear, if you find from a preponderance of the evidence in this case that:
1. The defendants Big 10 Tire Company and Goodyear were negligent; and
2. Travis C. Kirby was negligent; and
3. The negligence of both the defendants and Travis C. Kirby were proximate contributing causes of the accident in question; and
4. The heirs of Travis C. Kirby, plaintiff, sustained damages caused by the combined negligence of the defendants and Travis C. Kirby;
then you will, in arriving at your verdict, first determine the sum of money which will fairly and adequately compensate the heirs of Travis C. Kirby for said damages, and then reduce this sum in proportion to the causal negligence of Travis C. Kirby, using the following method:
1.Determine the proportion that Travis C. Kirby’s causal negligence bears to the causal negligence as a whole, as a part or percentage of 100 percent = total causal negligence of both the defendants and Travis C. Kirby;
2. Multiply the sum of money you determined as plaintiffs damages by the percentage figure representing the proportion of Travis C. Kirby’s causal negligence;
3. Subtract the result of your multiplication from the sum you first determined to be the heirs of Travis C. Kirby’s damages;
4. Return a verdict for that amount for the heirs of Travis C. Kirby, plaintiff.
¶ 52. Instruction No. 42 regarded the apportionment of damages for plaintiff Strickland and read as follows:
On the claim of Riley Strickland against the defendants, Big Ten Tire Company and Goodyear, if you find from a preponderance of the evidence in this case that:
1. The defendants Big 10 Tire Company and Goodyear were negligent; and
2. Riley Strickland was negligent; and
3. The negligence of both the defendants and Riley Strickland were proximate contributing causes of the accident in question; and
4. Riley Strickland, plaintiff, sustained damages caused by the combined negligence of the defendants and Riley Strickland;
then you will, in arriving at your verdict, first determine that sum of money which will fairly and adequately compensate Riley Strickland for said damages, and then reduce this sum in proportion to the causal negligence of Riley Strickland, using the following method:
1. Determine the proportion that Riley Strickland’s causal negligence bears to the causal negligence as a whole, as a part or percentage of 100 percent = total causal negligence of *302 both the defendants and Riley Strickland;
2. Multiply the sum of money you determined as Riley Strickland’s damages by the percentage figure representing the proportion of Riley Strickland’s causal negligence;
3. Subtract the result of your multiplication from the sum you first determined to be Riley Strickland’s damages;
4. Return a verdict for that amount for Riley Strickland, plaintiff.
¶ 53. Instruction No. 43 was for plaintiff Odom and reads as follows:
On the claim of Sidney Odom against the defendants, Big 10 Tire Company and Goodyear, if you find from a preponderance of the evidence in this case that:
1. The defendants Big 10 Tire Company and Goodyear were negligent; and
2. Sidney Odom was negligent; and
3. The .negligence of both the defendants and Sidney Odom were proximate contributing causes of the accident in question; and
4. Sidney Odom, plaintiff, sustained damages caused by the combined negligence of the defendants and Sidney Odom;
then you will, in arriving at your verdict, first determine that sum of money which will fairly and adequately compensate Sidney Odom for said damages, and then reduce this sum in proportion to the causal negligence of Sidney Odom, using the following method:
1.Determine the proportion that Sidney Odom’s causal negligence bears to the causal negligence as a whole, as a part or percentage of 100 percent = total causal negligence of both the defendants and Sidney Odom;
2. Multiply the sum of money you determined as Sidney Odom’s damages by the percentage figure representing the proportion of Sidney Odom’s causal negligence;
3. Subtract the result of your multiplication from the sum you first determined to be Sidney Odom’s damages;
4. Return a verdict for that amount for Sidney Odom, plaintiff.
¶ 54. The Kirby plaintiffs lodged objections to the portion of the trial court’s instruction about the comparative-negligence computation saying it was “preemptive in nature.” Goodyear objected to the judge’s instruction “just as a general objection, that we feel it’s confusing.” However, the trial court overruled the objections and gave the court’s instructions. The judge also prepared and gave a general form of the verdict instruction.
¶ 55. The jury deliberated more than ten hours during the course of two days before returning its verdict. The jury returned a verdict in favor of all three plaintiffs against Goodyear, but the verdicts were in differing amounts. The verdicts read as follows:
We the jury find for the plaintiff, the heirs of Travis B. Kirby, and assess the damages at $733,333.40 (seven hundred thirty-three thousand three hundred thirty-three dollars and forty cents).
We the jury find for the plaintiff, Riley Strickland, and assess his damages at $117,963.34 (one hundred seventeen thousand nine hundred sixty-three dollars and thirty-four cents).
We the jury find for the plaintiff, Sidney Odom, and assess his damages at $1,754,800.00 (one million seven hundred *303 fifty-four thousand eight hundred dollars).
¶ 56. Following the jury’s decision, the judge polled the jury asking if the verdicts as announced were the decisions of all of the jurors, and each juror responded that they were.
¶ 57. When the instructions which were given are read as a whole, we find that there was no error by the trial court regarding the form of the verdicts. We find that proper apportionment instructions were given to the jury.

The Juror Affidavit

¶ 58. Goodyear’s attorney, Baxter, attempted to influence the outcome of this issue by offering an affidavit of a juror to show how the jury reached its verdicts for the Kirby plaintiffs. At the hearing on the motion for a new trial, Baxter said that the affidavit would show that the jurors used an improper quotient verdict. The trial court immediately disallowed the affidavit saying that there was “very solid” well-stated law prohibiting the introduction of an affidavit from a juror that goes into the thought processes of the jurors which took place in the jury room. The judge said that he had read the affidavit and found that it set out: what the jurors talked about, what they thought about, and how they arrived at their verdicts in the case. The judge found that the affidavit did not offer any facts about any outside influence which the jury may have been subjected to. As such, he ruled that the affidavit was prohibited.
¶ 59. If there is an inquiry into the validity of a jury’s verdict, a juror cannot testify “as to any matter or statement occurring during the course of the jury’s deliberations or to the effect of anything upon his or any other juror’s mind or emotions as influencing him to assent to or dissent from the verdict ... concerning his mental processes in connection therewith.” M.R.E. 606(b). The only exception to this prohibition is that a juror may testify about whether “extraneous prejudicial information was improperly brought to the jury’s attention or whether any outside influence was improperly brought to bear upon any juror.” Id.
¶ 60. In denying the submission of the affidavit, the trial court said that attempting to introduce such an affidavit was a “very, very, very dangerous area ... because what you’re doing then is going into the jury room and the thought process and part of the deliberations.” Unless “a threshold showing of external influences” is presented, an inquiry into a jury’s' verdict should not be made. Gladney v. Clarksdale Beverage Co., 625 So.2d 407, 419 (Miss.1993).
¶ 61. We have examined the affidavit and will not reprint it here as it does exactly what the trial court said. It sets out the thought processes of the jurors and what was on their minds when they assessed the damages. Goodyear has made no allegation of external influences that may have tainted the jury’s verdicts. Instead it is an attempt through the juror’s affidavit to make an entry into the thought processes and deliberations of the jury, which we will not allow. Therefore, we affirm the trial judge’s rejection of the admission of the juror’s affidavit. Also, we strongly warn trial attorneys to refrain from such post-judgment canards.
¶ 62. The defendants were entitled to an apportionment-of-damages instruction that properly stated the law. However, that entitlement did not require the instruction be one of the defendants’ drafting or choosing. Trial courts enjoy “considerable discretion regarding the form and substance of jury instructions.” Splain v. Hines, 609 So.2d 1234, 1239 *304 (Miss.1992). When we review instructions, our primary concern is that the jury was fairly instructed on the applicable primary rules of law and that each party’s proof-grounded theory of the case was placed before the jury. Id. In this case, the trial court’s collective apportionment-of-damages instructions fairly and correctly applied the law and each party’s theory of the case, for which there was evidentiary support, were placed before the jury. Thus, we find that the jury was properly instructed on apportionment of damages. This assignment of error is without merit.
V. MISCONDUCT REGARDING THE JURY FOREPERSON REQUIRES A NEW" TRIAL.
¶ 63. In this alleged error Goodyear claims juror misconduct. Specifically, Goodyear claims a juror and an attorney for the plaintiffs, failed to disclose certain information, which it claims would have kept the juror off of the jury. Goodyear said that the juror: (1) failed to disclose during voir dire that she had a son who was killed in an automobile accident, and (2) the juror and plaintiffs’ attorney, Dan Kitchens, failed to disclose that Dan Kitchens served as a pallbearer at the juror’s son’s funeral. The juror went on to become the jury foreman.

(A) Disclosure of the Juror’s Son’s Accidental Death

¶ 64. It was never clearly established in the record whether the juror’s son’s fatal wreck involved alcohol. During voir dire, Goodyear directly questioned prospective jurors about drunk driving with the following question: “How many of you have either yourself or had a family member of yours or a friend of yours that was injured in an automobile accident where the driver had been drinking alcohol?” Three prospective jurors raised their hands and explained that they had friends who had been injured or killed by a drunk driver. Prospective juror D.K.[7] did not respond to the question. However, at an unrelated criminal trial,[8] which was heard three days earlier, and involved the same jury pool and the Kitchens Law Firm representing the defendant, D.K. was asked a similar question and responded that her son had been killed in an automobile accident in 1996. In that criminal trial,[9] James Kitchens, who was representing the defendant, explained the elements of vehicular manslaughter and then asked the jury: “Ladies and gentlemen, with that explanation, has anyone close to you been involved in that kind of situation?”
¶ 65. D.K. raised her hand, and Kitchens responded. The following exchange took place:
Q. All right. Thank you. That’s [D.K.] raising her hand. And, [D.K.], do you mind if I follow up with that a little bit? Of course, I don’t want to embarrass you in any way. I know you lost your son, and I remember it so well. You would probably agree with me that you think about that every day, don’t you?
*305 A. Yes, sir.
Q. And your son and two other young men died in a tragic accident.
A. 10 years ago.
Q. Oh, has it been that long? And ten years later it’s still very prominent in your thinking all the time.
A. Yes, sir.
Q. In this case Ms. Tillman lost her son, and Travis Braddy is accused of driving under the influence, which I will tell y’all right now he admits — he admits that he had drunk beer that night before this accident....
Now, with that in mind, do you think, [D.K.], that you would tend to identify more with Travis or with Ms. Tillman who lost her son?
A. I would try very hard to be fair, but I would identify with Ms. Tillman.
¶ 66. Further in the criminal voir dire, the jurors were asked if they drank alcohol, and D.K. responded that she did not and further offered that she was a crusader against alcohol and would prefer a return to prohibition. She was challenged for cause and was excused in the criminal case.
¶ 67. Goodyear contends that had D.K. answered honestly during voir dire about her son dying in a wreck, then it would have stricken her for cause. However, Goodyear’s argument on this point becomes moot when the testimony at the motion for new trial hearing is read. Goodyear’s attorney, Baxter, admitted that he did know prior to voir dire that D.K’s son had been killed in an automobile accident. “We did know that she had a son that had been killed in a drunk driving incident, and, of course, if she’s in favor of prohibition, that sounds like a good defense juror[.]” These remarks of Goodyear’s counsel show that he knew about the accident in which D.K’s son was killed. He heard at the prior voir dire that she had lost a son in an automobile accident, and knowing that, he allowed her to remain on the jury. Thus, we find that this part of the argument is waived by Goodyear.

(B) Relationship Between the Juror and Dan Kitchens

¶ 68. The jury pool was asked during voir dire about their relationship, if any, with the counsel for the plaintiffs. No juror indicated that he or she had a relationship with any of the attorneys. After the trial, it was disclosed to the attorneys for Goodyear by one of the other attorneys for the plaintiffs that Dan Kitchens, an attorney for the plaintiffs, had served as a pallbearer at the funeral of juror D.K’s son. Goodyear contends that Dan Kitchens and juror D.K. should have disclosed this relationship and that had they done, so Goodyear would have removed D.K. from the jury.
¶ 69. Dan Kitchens was present at the motion for a new trial hearing and testified as an officer of the court that he did not know D.K., but he had served as a pallbearer at her son’s funeral in 1996. He said that he did so because he was asked to serve by D.K’s son’s girlfriend with whom he was close. D.K. had asked her son’s girlfriend to help get the pallbearers. The attorneys for the Kirby plaintiffs pointed out that D.K.’s son was one of three college students, all from Copiah County, killed in the wreck and that many young men from the area were needed to serve as pallbearers. Dan Kitchens testified that he knew D.K’s son because they were students at the University of Southern Mississippi together and had grown up together, but he said that he would never have been a pallbearer if D.K’s son’s girlfriend, whom he knew much better, had not asked him. Dan Kitchens said that he did not know D.K. and would not be able *306 to recognize her. His father, James Kitchens, had already told the court that D.K. did not attend their church, had not visited in their home, nor had they visited in her home. The question then becomes whether this lack of disclosure by the juror and the plaintiffs’ attorney is enough to constitute juror misconduct.
¶ 70. “The selection of jurors is a ‘judgment call peculiarly within the province of the circuit judge, and one we will not on appeal second guess in the absence of a record showing a clear abuse of discretion.’ ” Adkins v. Sanders, 871 So.2d 732, 740 (¶ 31) (Miss.2004) (quoting Brown ex rel. Webb v. Blackwood, 697 So.2d 763, 771 (Miss.1997)). An appellate court will only reverse the trial court when the court “clearly is of the opinion that a juror was not competent.” Id. (quoting Fleming v. State, 732 So.2d 172, 181 (¶ 27) (Miss.1999)). Further, the promise of a prospective juror that he or she will remain impartial is given great deference even when circumstances raise questions about his or her qualification to serve. Adkins, 871 So.2d at 742 (¶ 40).
¶ 71. The standard of review for juror misconduct arising from a failure to respond to questions during voir dire is as follows: Where a prospective juror fails to respond to a question by defense counsel on voir dire, the court should determine whether the question was: (1) relevant to the voir dire examination, (2) whether it was unambiguous, and (3) whether the juror had substantial knowledge of the information sought to be elicited. If all answers to the above questions are affirmative, then the court determines if prejudice to the defendant in selecting the jury can be inferred from the juror’s failure to respond. Barker v. State, 463 So.2d 1080, 1083 (Miss.1985) (citing Odom v. State, 355 So.2d 1381 (Miss.1978)). This test, although frequently applied in criminal trials, is equally applicable to allegations of juror misconduct in civil suits. See T.K. Stanley, Inc. v. Cason, 614 So.2d 942, 948 (Miss.1992). Moreover, the Odom test has been expanded to include a fourth prong requiring that “prejudice ... in selecting the jury could reasonably be inferred from the juror’s failure to respond.” Payton v. State, 897 So.2d 921, 954 (¶ 131) (Miss.2003) (citing Chase v. State, 645 So.2d 829, 847 (Miss.1994)). “There is no ‘unbending rule for every situation that might arise’ on the voir dire of prospective jurors,” so each case must be decided on the facts of that case. Mariner Health Care, Inc. v. Estate of Edwards, 964 So.2d 1138, 1147 (¶ 19) (Miss.2007).
¶ 72. “There is no absolute rule of disqualification based on a juror’s relationship to an attorney in the case.” Thompson v. O’Rourke, 288 S.C. 13, 339 S.E.2d 505, 506 (1986) (citing State v. Nicholson, 221 S.C. 399, 70 S.E.2d 632 (1952)). The circumstances of each case determines whether a basis for disqualification exists. Id.
¶ 73. When we apply the Odom test, we find that there was no juror misconduct. First, the question of whether the jurors knew any of the attorneys was relevant. While not in itself a disqualifying relationship, it can become so upon further inquiry. Second, the question was not ambiguous as the jurors were simply asked if they knew any of the plaintiffs’ attorneys. However, the test ends on the third prong. Goodyear had the burden on appeal to show that D.K. had knowledge that Dan Kitchens served as a pallbearer at her son’s funeral and that this relationship should have disqualified her from serving on the jury in this case. Despite Goodyear’s arguments, the record stands uncontradicted that she did not know. Goodyear offered no proof of her knowl *307 edge on the pallbearer issue. Instead, Goodyear focused on D.K.’s failure to answer a voir dire question about whether some family member had been killed in an auto accident involving alcohol. Thus, from the uncontradicted evidence, we find no juror misconduct by D.K.
¶ 74. As to alleged error by Dan Kitchens’s failure to disclose his status as a pallbearer at D.K.’s son’s funeral, we do not find that his service under the circumstances surrounding the funeral would have required him to disclose the fact of his service. None of the Kitchens lawyers said that he was personally acquainted with the D.K. Dan Kitchens said that he knew the son, but he had served as a pallbearer at the behest of D.K’s son’s girlfriend, who was a good friend of his. He said he did not know the mother, D.K., and before this became an issue, he could not have “picked her out of a lineup.” The circumstances surrounding D.K.’s son’s accident and the subsequent need for young pallbearers for three young Copiah County men, further makes his jury service less relevant as to showing a relationship between him and D.K. In denying Goodyear’s motion, the trial judge said he took into consideration the fact that all jurors took an oath that they would be fair, and further he noted that the verdict was unanimous. The juror’s oath is given great deference. Adkins, 871 So.2d at 742 (¶ 40). We also note the remoteness in time of the events. The funeral happened during Thanksgiving of 1996, while the trial was held almost a decade later in October 2006. With these factors in mind, we do not find that the trial court abused its discretion when it denied Goodyear’s motion. This assignment of error is without merit.
VI. THE JURY WAS INFLAMED AND PREJUDICED BY IMPROPER REMARKS OF PLAINTIFFS’ COUNSEL.
¶75. Goodyear argues that plaintiffs’ counsel made inappropriate and prejudicial remarks throughout the trial in an effort to bias the jury against Goodyear. Specifically, Goodyear lists six statements made by plaintiff Odom’s counsel, Allred. The crux of Goodyear’s complaint about the remarks is that they went solely to an award of punitive damages, a claim which was never submitted to the jury.
¶ 76. In order for this Court to reverse a judgment based on an improper-argument claim, “we must first find an ‘abuse, unjustified denunciation or a statement of fact not shown in the evidence’ ” and, second, “find that it was probable that the improper statement had a harmful influence on the jury.” Woods v. Burns, 797 So.2d 381, 384 (¶ 10) (Miss.Ct.App.2001).
¶ 77. The standard of review of alleged lawyer misconduct during opening statements and/or closing arguments is summarized as follows:
Attorneys have wide latitude in closing arguments. Notwithstanding the wide latitude afforded in closing arguments “[t]he standard of review that appellate courts must apply to lawyer misconduct during opening statements or closing arguments is whether the natural and probable effect of the improper argument is to create unjust prejudice ... so as to result in a decision influenced by the prejudice so created.” This Court has held that “any alleged improper comment must be viewed in context, taking the circumstances of the case into consideration.” The trial judge is in the best position to determine if an alleged objectionable remark has a prejudicial effect.
Burr v. Mississippi Baptist Med. Ctr., 909 So.2d 721, 724-25 (¶ 7) (Miss.2005) (quot *308 ing Eckman v. Moore, 876 So.2d 975, 994 (¶ 73) (Miss.2004)).
¶ 78. In accordance with these standards, we have grouped the statements about which Goodyear complains by when they occurred in the trial. This grouping will allow us to review the statements in context. We note at the outset that the first three statements which Goodyear finds objectionable were all made in close proximity during Allred’s opening statement.

(A) Statements Made by the Plaintiff Attorney During Opening Statements

(1) “Now, I believe the proof is going to show that Goodyear is going to make the best effort it can to hide the evidence of this tread throw problem.”

¶ 79. When this statement was made, Goodyear’s attorney, Baxter, objected on the basis of relevance and that the statement went to punitive damages. The trial court overruled the objection but told the jury, “Ladies and gentlemen, keep in mind again that there’s been no evidence produced in this case yet.”
¶ 80. Prior to the beginning of the opening statements, the judge told the jury that what they would hear from the lawyers during opening statements was not evidence. He said:
The opening statement! ] is an opportunity for each side to tell you what they anticipate that the evidence is going to show in this case. Now, I want you to keep in mind what the attorneys tell you is not evidence. What they say is not evidence in the case. You will hear the evidence by way of the sworn testimony of the witnesses from the witness stand and also any documents or exhibits that the court allows to be introduced into evidence. But the opening statement is very helpful because it will give you a whole lot better idea about what this case is all about or what each side see[s] this case is being all about. So again, keep in mind this is what each side is telling you that from their prospective what they feel like the evidence is going to show in this case, but again, what they tell you is not evidence in this case.
¶ 81. Further at the trial’s conclusion, the judge gave Instruction No. 1 which told the jury that counsels’ arguments, statements, and remarks are intended to help the jury understand the evidence and apply the law, “but they are not evidence.” And further, the entire meaning of Instruction No. 9 was cautioning jurors to look at the evidence and apply their own recollection and interpretation and not find that the statements, objections, and arguments of the lawyers are evidence. “What the lawyers say is not binding on you,” the instruction read.
¶ 82. It is the rule of law in Mississippi that the jury is presumed to follow the instructions of the trial court. Fielder v. Magnolia Beverage Co., 757 So.2d 925, 937 (¶ 41) (Miss.1999). In fact, the juror’s oath requires that he or she do so. Id.
¶ 83. With all of the court’s admonitions, including instructions that Allred’s statements were not evidence, we find no error.

(2) “Goodyear did made a choice, and they chose to do the wrong thing, the dangerous thing, to sell them to save a dollar or two.”

¶ 84. After this statement, Baxter objected on the basis of relevance saying the remark “goes to punitives.” The trial court overruled the objection. This statement by Allred was made shortly after statement (1) discussed supra. As explained above, the trial court had just advised the jury that what the lawyer said was not evidence and very likely this ad *309 monition was fresh on the minds of the jurors when the second statement was made. But if it was not, we find that the two jury instructions were more than adequate to let the jurors know that the lawyer’s statement was not evidence.

(3) ...“and I find this shocking, Goodyear chose to save money by putting the American people’s lives at risk by selling these high performance tires without these improvements that make them safer and stronger exactly like the ones they use in Europe and South America, and if I’m pointing right, Asia.”

¶ 85. When Allred made this statement, the Kirby plaintiffs still had a claim based upon Goodyear’s alleged defective design of the tire. He was advocating his position that there was a relatively inexpensive fix for the design which Goodyear had made on tires which are sold abroad, but it did not make the change on American tires. Goodyear made no objection after this statement was made. Under the well-established contemporaneous-objection rule, “if no contemporaneous objection is made, the error, if any, is waived.” Walker v. State, 913 So.2d 198, 238 (¶ 148) (Miss.2005). The rule is in place to enable the trial court to correct an error with proper instructions to the jury whenever possible. Gray v. State, 487 So.2d 1304, 1312 (Miss.1986). Applying the rule, we find that Goodyear waived its right to claim this statement as error by failing to object to it at trial.

(B) During Cross-examination of Plaintiffs Expert Witness Ochs

(1) “Because Goodyear willfully refused any documents — ”
¶ 86. Actually this statement was an objection Allred made following an answer on cross-examination by the plaintiffs’ expert Ochs. In context the testimony reads as follows:
Q. [Baxter]: Now, I believe you testified earlier you could not point to any specific defect in this tire?
A. [Ochs]: That’s correct.
BY MR. ALLRED: Because Goodyear tvillfully refused any documents—
BY THE COURT: I overrule the objection.
BY MR. BAXTER: Having looked at this tire can you tell this jury — you can’t point to the defect, correct?
BY MR. ALLRED: Objection, Your Honor—
BY THE COURT: I’ll rule on that objection at a later time. I think he can answer.
(Emphasis added).
¶ 87. Discovery, or more specifically the lack of discovery, was a point of contention which the attorneys for the plaintiffs often brought to the attention of the trial court. Ultimately, as discussed in Issue III supra, the trial court recognized that Goodyear had been less than forthcoming in its discovery response. The judge ordered Goodyear to make certain depositions available to the Kirby plaintiffs on the eve of the trial after the plaintiffs showed the trial court that there was un-produced expert testimony from other states about possible defective Goodyear tire design. When read in context, we find that trial court treated Allred’s statement like an objection which the court then overruled. After the objection was overruled, Goodyear continued with its cross-examination of Ochs. We find no abuse of discretion in the way in which the trial court handled this statement. Such action must have satisfied Goodyear as it made no objection and continued on with its questioning of the plaintiffs’ expert wit *310 ness. We find no error regarding this statement.
(2) “Your Honor, may I have a continuing objection then that Goodyear has absolutely concealed all of — ”
¶ 88. This statement was made a little later during Goodyear’s cross-examination of Ochs. In context, Ochs told Baxter that he did not understand his question, then the following was said:
Q. [Baxter]: Well, wouldn’t you expect if there was a design defect in the tire that you would see a lot more accidents and lawsuits?
BY MR. ALLRED: Objection.
BY THE COURT: I’ll allow him to answer that question if he can. Again, I don’t—
BY MR. ALLRED: Your Honor, may I have a continuing objection then that Goodyear has absolutely concealed all of—
BY MR. BAXTER: — I strongly object. That’s totally improper.
BY THE COURT: Just a second, Mr. Allred. I’m going to overrule the objection. But again, let’s try to stick within the issues that’s been brought out by this witness on his direct examination.
BY MR. BAXTER: Thank you.
(Emphasis added).
¶ 89. The first thing which we note about this statement is that it resulted in a ruling favorable to Goodyear. All-red made the statement to which Goodyear “strongly” objected and the trial court overruled Allred’s continuing objection. No citation is needed for the proposition that a party cannot claim as error on appeal a decision which is in its favor.

(C) During Plaintiffs’ Closing Argument: “It is not proper for Goodyear to tell you they can condemn people to death.”

¶90. After this statement, Baxter objected saying the statement was “extremely inflammatory, and we’ve never, ever said that.”
¶ 91. The record continues:
THE COURT: All right.
MR. BAXTER: Request that you instruct the jury to disregard that statement.
THE COURT: All right. This is closing argument, but Mr. Allred, let’s please move on now. Let’s—
MR. ALLRED: Thank you—
THE COURT: — confine it—
MR. ALLRED: — Your honor. I will.
THE COURT: — to proper argument.
¶ 92. This statement without doubt was improper. The trial court recognized the inflammatory nature of the statement and told Allred to “move on.” He further told Allred to confine his closing statements to “proper arguments.”
¶ 93. While we do find this statement improper, we do not find that it was probable that the statement alone had a harmful influence on the jury. The trial court recognized that Allred’s statement was out of line and told him to move on and confine his remarks to proper argument. Further as mentioned earlier, the trial court instructed the jury that attorney’s argument is not evidence.
¶ 94. When all of the statements which Goodyear cites as objectionable are considered in context, we fail to find that the trial court erred in its rulings. Therefore, this argument is without merit.
VII. WHETHER THE TRIAL COURT ERRED IN DENYING DEFENDANTS’ MOTION FOR RE-MITTITUR.
*311 ¶ 95. Goodyear claims it was error for the trial court to deny its motion for remittitur. It sought to have the trial court change the jury’s verdict: (1) by offering an affidavit of one of the jurors which stated how the jurors arrived at their verdict amounts and (2) by arguing that the more than $1.7 million verdict for Odom and the $738,333.40 verdict for Kirby were so contrary to the evidence that the amounts awarded “strike mankind at first blush as being beyond all measure, unreasonable in amount and outrageous,” citing Wallace v. Thornton, 672 So.2d 724, 729 (Miss.1996).
¶ 96. The standard of review on appeal for considering a denial of a remittitur is limited to determining whether the trial court abused its discretion. Ross-King-Walker, Inc. v. Henson, 672 So.2d 1188, 1193 (Miss.1996). We will not vacate or reduce a damage award unless it is so out of line as to shock the conscience of the Court. Anderson v. Jaeger, 317 So.2d 902, 907 (Miss.1975).

(A) Judgments for Kirby and Odom Were Excessive and Contrary to the Overwhelming Weight of the Evidence

(1) Strickland Damages

¶ 97. Goodyear offers no argument regarding the $117,963.34 verdict for Strickland. Therefore, the Strickland verdict is affirmed.

(2) Estate of Kirby Damages

¶ 98. Goodyear claims that it was outrageous as well as inflammatory to award the estate of Kirby $733,333.40. Goodyear points out that Kirby, the car driver, had a blood-alcohol level of .25 and was driving at 92 miles per hour at the time of the accident. Goodyear says that Kirby had no medical bills since he died on the scene, and no evidence was presented regarding conscious pain and suffering. Goodyear argues that since Kirby’s actual damages were only about half of what the jury awarded his estate, then the jury must have awarded hedonic damages in violation of state law.[10]
¶ 99. In a wrongful death action, a party “shall recover such damages allowed by law as the jury may determine to be just, taking into consideration all the damages of every kind to the decedent and all damages of every kind to any and all parties interested in the suit.” Miss.Code Ann. § 11-7-13 (Rev.2004). Our courts have held that this language includes funeral *312 and medical expenses of the decedent, the present net cash value of the life expectancy of the decedent, the loss of society and companionship of the decedent, the pain and suffering experienced by the deceased between the time of the injury and his subsequent demise, and punitive damages, if so found. McGowan v. Estate of Wright, 524 So.2d 308, 311 (Miss.1988) (citing Jesco, Inc. v. Whitehead, 451 So.2d 706, 710 (Miss.1984)).
¶ 100. The following damages were proven by the Estate of Kirby:
$343,525.41 actual net cash value of life expectancy as testified to by an expert in the field of economic loss analysis
$ 6,426.00 funeral expenses
$ 4,718.70 headstone
$354,670.11 total actual damages
¶ 101. Further, Kirby’s mother, Shirley Kirby, testified on behalf of the estate as to the extreme damages caused to the family from the loss of society and companionship by his untimely death. Kirby was twenty years old at the time of his death, and his mother said he still lived at home with his parents and older brother, Nick. She said they were a tight-knit family who enjoyed each other’s company. She testified that they fished together, rode four-wheelers together, and Kirby was his father’s hunting partner. Kirby attended the New Zion Baptist Church and was “an all round good kid. He would give the shirt off of his back for anyone,” she said. According to his mother, Kirby made his family happy all of the time. She said that Kirby and his brother, Nick, were close. She was asked by her attorney to give a summary of the effect the loss of Kirby has had on the family. She responded, “It’s just been devastating. There’s not a day that goes by that he’s not missed or thought of. I just — I miss him so much.”
¶ 102. Considering the actual damages and the testimony of Kirby’s mother as to the family’s loss of society and companionship of a young son and brother on the verge of manhood, and the pain and suffering he must have experienced between the time of the tire’s rupture when he was alive and when the rolling automobile stopped against a tree and he was dead, we find that the jury’s award was proper. There was evidence to support the damages, and further we find that the jury award to the estate of Kirby was not based upon improper hedonic damages.

(3) Odom Damages

¶ 103. Goodyear argues that the award of $1,754,800 in damages to Odom “shocks the conscience” making a remitti-tur proper, citing Community Bank, Ellisville, Mississippi v. Courtney, 884 So.2d 767, 776 (¶ 32) (Miss.2004). Goodyear points out that Odom holds a full-time job at Nissan in Canton making $20 an hour. He testified that he considered himself fully recovered, and since the wreck, he has married and fathered a child. Further, Odom represented on a job application and health questionnaire nine months after the accident that he was completely recovered, released from all doctors, had no disabilities, and was willing to travel for the job and to work overtime and weekends.
¶ 104. At first blush, it appears that the damages were excessive in relation to the injuries. However, when the expert and medical testimonies are considered, a different picture emerges. The following damages were proven by Odom:
$162,020.34 Medical bills from the University of Mississippi Medical Center
$158,060.44 Future medical bills and expenses as testified to by expert testimony
¶ 105. When the first person arrived at the crash scene, he found Odom uncon *313 scious, and Odom remained so for two weeks. He suffered a traumatic brain injury with his skull cracked and stitches and staples placed in his head to close the wound. His mother, Sue Odom, testified that when she and her husband first saw him in the emergency room in Jackson, they did not recognize him because he was so swollen all over. Because of the head injury, he was enrolled in the Quest Program for head-trauma patients through the University of Mississippi Medical Center and attended therapy from February 5, 2001, to October 22, 2001. He spent fourteen days in intensive care before he was put in a room. He had a right-scapular fracture which required surgery; a rod was put in his leg; he had a fracture in his face; his right rotator cuff was damaged; both bones in his left forearm were broken; and plates and screws were placed into his arm. During his hospital stay, he developed pneumonia. During his recovery, he said he was in extreme pain even though he was on strong pain medication. When he was released from the hospital and arrived home, he was an invalid, and his mother and sister had to assist him with eating, bathing, and going to the bathroom. He called that situation humiliating. He had to do physical and occupational therapy for five days a week from late August until December 2000. He had twenty-two sessions of physical therapy, working on trying to get his left arm to move and to get him walking again. Some two years later, he was able to secure the position at Nissan. Since working at Nissan, he has applied for other work with an offshore oil company where he could make more money and have more chances of advancement. He was turned down, however, due to his medical condition. His mother testified that since the wreck Odom’s memory is poor, and it takes him longer to do tasks. She said he gets frustrated easily, and “[hje’ll blurt things out not meaning to, I don’t think, that will hurt people’s feelings, not intentionally, but just from the trauma that he’s had.” Dr. Howard Katz, a neurologist, performed an independent medical evaluation of Odom. Dr. Katz found that Odom has a permanent brain injury, has lost the use of his left forearm, has lost range of motion in his shoulder, which is secondary to a scapular fracture. Dr. Katz testified that Odom would continue to have pain in his left knee and ankle, and he will develop low back pain because one leg is shorter than the other as a result of surgery following the accident. Dr. Katz said Odom has permanent severe problems with his left arm which will not improve. Further, Dr. Katz testified that Odom has brain damage to the part of his brain that affects his ability to learn and to perceive, in particular to remember things that he learns with his eyes. He said that Odom had lost thirty percent of the use of his left leg, and he estimated that Odom had suffered a thirty-seven percent impairment to his body as a whole due to the car accident.
¶ 106. Dr. Judith O’Jile, an expert in neuropsychology, testified that she tested Odom and reported that his ability to look at things and visually understand them was in the borderline range. She said that Odom has problems with speed of processing information and working memory. Also she reported that he had social withdrawal, and he had told her that since the wreck he was a different person and no longer felt comfortable around his old friends. She testified that the brain injuries caused him not to be able to work at a job where he had to do more than one thing at a time and where he has to process a lot of information quickly.
¶ 107. We find that when the full degree of Odom’s injury is examined, a verdict of over $1.7 million does not shock the *314 conscience. He was in a coma for two weeks and was hospitalized for more than three. He suffered painful and permanent injury to his brain, shoulder, arm, and leg. While Odom testified that he thought he had fully recovered from the accident, the medical testimony paints a different picture, a picture of a young man who will not develop as he should because of his brain injury. And because of his injuries he will be limited in what employment he can pursue, thereby limiting his earning capacity. Thus, we find that Odom’s damage award was supported by the evidence, and the trial court did not abuse its discretion in refusing a remittitur.
VIII. WHETHER CUMULATIVE ERROR REQUIRES A NEW TRIAL.
¶ 108. In this argument Goodyear asks that we find that the cumulative effect of the errors combined to lead to a “patently unjust verdict of over $2 million” against it. Goodyear cites Blake v. Clein, 903 So.2d 710, 732 (¶ 68) (Miss.2005) in which the supreme court reversed and remanded a medical malpractice case after finding that the cumulative effect of the errors in the trial below deprived the appellant doctor and medical clinic of a fair trial. However, a necessary predicate to an inquiry about the effect of cumulative errors is a determination that multiple errors in the conduct of the trial, in fact, occurred. Once the Court has determined that the asserted individual errors are without merit, then the defendant’s claim of cumulative effect must be seen as without merit “by simple logic.” Sheffield v. State, 844 So.2d 519, 525 (1116) (Miss.Ct.App.2003) (citing Wilburn v. State, 608 So.2d 702, 705 (Miss.1992)). That is the situation now before the Court. Since we have found no error in any single error, we cannot find that there has been a cumulative effect of the errors. Therefore, this assignment of error is without merit.
¶ 109. Finding that there was no error by the trial court as raised by Goodyear, we affirm the trial court’s judgment. Because of this decision, we determine that the errors alleged in the Kirby plaintiffs’ cross-appeal are moot.
¶110. THE JUDGMENT OF THE CIRCUIT COURT OF COPIAH COUNTY IS AFFIRMED ON DIRECT APPEAL, AND THE CROSS-APPEAL IS DISMISSED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS/CROSS-APPELLEES.
LEE AND MYERS, P.JJ., IRVING, ISHEE AND ROBERTS, JJ„ CONCUR. CARLTON, J., CONCURS IN RESULT ONLY WITH SEPARATE WRITTEN OPINION. MAXWELL, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. GRIFFIS AND BARNES, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION.

. Although there are six appellees in the direct appeal who were the plaintiffs below— the estate of Kirby, his father, his mother, and his brother, Strickland and Odom — we will refer to them all for clarity as the Kirby plaintiffs. Likewise, we will reference the appellants as Goodyear unless there is a need to refer separately to Big Ten.

. According to the bulletin, which was dated October 27, 1995, "[t]he speed rating assigned to certain Kelly-Springfield Tires are an indication of the speed capability of those tires under specific laboratory test conditions. These ratings are not applicable, or valid, if the tires are underinflated, overloaded, worn out, damaged, altered, misused or improperly repaired.”

. The tires on the car were all Kelly-Springfield Charger SR tires, which is a trade name of Goodyear. The tires were warranted for 50,000 miles and had been driven about 10,-000 miles at the time of the accident.

. The court noted that under the Civil Justice Reform legislation of 2004, the law has changed and that Big 10 would now be allowed the innocent-seller defense; that is, where a retailer sells a product that it does not change in any way, and the retailer is unaware of any obvious defect in it, the retailer is essentially immune from liability. Miss. Code Ann. § 11—1—63(h) (Supp.2008). "It is the intent of this section to immunize innocent sellers who are not actively negligent, but instead are mere conduits of a product.” Id.

. At the hearing on Goodyear's motion for a judgment notwithstanding the verdict, Goodyear argued that the trial court erred by not removing the Robinson deposition and sum *300 mary sheet from the evidence as Goodyear requested since the case did not go to the jury on a defect theory; therefore, it was confusing for the jury to have the evidence. The trial court summarily rejected the withdrawal of the items of evidence that had already been presented to the jury saying that to do so would be an improper comment by the trial court on the evidence. "I think this would be a very dangerous practice to engage in to try to redo the evidence, in essence, after you get to the jury instructions and decide what issues the jury is going to be able to decide on,” the judge said. He added that the better practice is to limit the issues that the jury can consider and submit proper instructions. Further, he pointed out that Goodyear had not requested a limiting instruction about the deposition and summary-report evidence. We find that the trial judge was well within his discretion in allowing the two items to remain in evidence.

. We note that this code section has been changed and is currently found at section 85-5-7(5) and reads as follows: "In actions involving joint tort-feasors, the trier of fact shall determine the percentage of fault for each party alleged to be at fault without regard to whether the joint tort-feasor is immune from damages. Fault allocated under this subsection to an immune tort-feasor or a tort-feasor whose liability is limited by law shall not be reallocated to another other tort-feasor.” Miss.Code Ann. § 85-5-7(5) (Supp.2008).

. It serves no purpose to name the juror, therefore, we will refer to her by the initials D.K.

. A copy of the voir dire of the jury from the Copiah County Circuit Court case of State of Mississippi v. Travis Braddy, No. 2005-0108CR, conducted on October 23, 2006, was included in the record.

. Circuit Court Judge Frank Vollor of Vicksburg presided over the criminal case by special appointment, while the instant case was presided over by special appointment by Circuit Court Judge Forrest A. Johnson, Jr., of Natchez. The special appointment became necessary when District 22 Circuit Court Judge Lamar Pickard of Hazlehurst, on his own motion, entered an order of recusal because James Kitchens was representing him in a legal matter.

. Hedonic damages have been described as the damages for the loss of the enjoyment of life, which purportedly compensate an injured person for the loss of quality of life or in the case of a wrongful death action for the value of life itself. Victor E. Schwartz & Cary Silverman, Hedonic Damages, The Rapidly Bubbling Cauldron, 69 Brooklyn L.Rev. 1037 (Spring 2004). Courts have defined these damages as compensating for "the inability to perform activities which had given pleasure to this particular plaintiff, which are distinguished from basic losses, which are, disabilities that include the basic mechanical body functions of walking, climbing, feeding oneself and so on.” McGarry v. Horlacher, 149 Ohio App.3d 33, 775 N.E.2d 865, 877 (2002). The courts which allow hedonic damages have found such factors as "the ability to enjoy the occupation of your choice, activities of daily living, social leisure activities, and internal well-being” as appropriate for consideration. Smith v. Ingersoll-Rand Co., 214 F.3d 1235,1245-46 (10th Cir.2000). Mississippi briefly considered the award of damages for the lost enjoyment of “going on a first date, reading, debating politics, the sense of taste, recreational activities, and family activities." Kansas City S. Ry. Co. v. Johnson, 798 So.2d 374, 381 (¶ 23) (Miss.2001) (overruled on other grounds and superceded by statute). However, when the Mississippi Legislature enacted, effective January 1, 2003, Mississippi Code Annotated section 11-1-69, the section flatly rejected the awarding of hedonic damages in wrongful death lawsuit. "In any wrongful death action, there shall be no recovery for loss of enjoyment of life caused by death.” Miss.Code Ann. § 11-1-69(2) (Supp.2008).