# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 19, 2011

No. 09-60651

Lyle W. Cayce
Clerk

LISA LEARMONTH,

Plaintiff - Appellee
Cross - Appellant,

v.

SEARS, ROEBUCK AND CO.,

Defendant - Appellant
Cross - Appellee

Appeal from the United States District Court
for the Southern District of Mississippi

Before KING, STEWART, and OWEN, Circuit Judges.

KING, Circuit Judge:

A jury found Sears, Roebuck and Company liable for causing Lisa
Learmonth's injuries in an automobile accident and awarded her $4 million in
compensatory damages. The district court denied Sears' motion for a new trial,
but remitted the non-economic damages portion of the award to $1 million
pursuant to Mississippi's statutory cap on non-economic damages. Sears appeals
the district court's denial of its motion for new trial; Learmonth cross-appeals
the constitutionality of the Mississippi statutory cap. We affirm the district
court's judgment insofar as it denied a new trial and certify the state
constitutional question to the Supreme Court of Mississippi.

No. 09-60651

## I.  BACKGROUND

Plaintiff Lisa Learmonth was seriously injured in a car accident at the intersection of Mississippi State Highways 15 and 485.  The collision involved Learmonth's car, which she was driving, and a Sears, Roebuck and Company ("Sears") van driven by James McClelland, a Sears employee.  Sears contested both liability and damages at trial.

The primary factual dispute as to liability was which driver was traveling on Highway 15, which runs north and south, and which driver was traveling on Highway 485, which runs east and west at that juncture.  The question was a critical one, as there is a stop sign on Highway 485—but no stop sign on Highway 15—at the intersection where the accident took place.  Therefore, whoever was driving on Highway 15 had the right-of-way.  Both drivers claimed that the other had been traveling east on Highway 485 and had run the stop sign at the intersection, causing the collision.

Eight fact witnesses testified in connection with the liability issue, including Learmonth and McClelland.  Learmonth, who suffered head trauma from the collision, testified that she did not remember the accident itself, but that she had been heading north on Highway 15 to pick up her mother that day and had called her mother from a town south of the intersection on Highway 15.  Phone records verified that Learmonth called her mother about fifteen minutes before the accident occurred.  McClelland testified that he completed a service call at the home of Bud Dees, a quarter-mile north of the intersection on Highway 15, and was driving south on Highway 15 when Learmonth's car entered his path. At trial, he testified that he could not remember what time he left Dees' home, but in earlier depositions he testified that he left around 11:30 a.m. The accident occurred around 1:30 p.m. Sears submitted an affidavit stating that it was unable to locate any information or records, electronic or otherwise, regarding the service calls, deliveries, or repairs made by McClelland

2

on the day of the accident, and it was thus unable to confirm McClelland's whereabouts on the day of the accident.

One eyewitness testified that he saw the Sears van run the stop sign. Two other witnesses placed Learmonth traveling north on Highway 15 near the time of the accident; one of those witnesses stopped to render aid at the scene until emergency personnel arrived. Three witnesses, including McClelland, testified that the vehicles came to rest in the northeast quadrant of the intersection. One witness, however, placed the Sears van in the northeast quadrant and Learmonth's car in the northwest quadrant.

Several witnesses testified about McClelland's actions immediately following the accident. Two witnesses stated that he ran towards or into the woods near the intersection, with one of those witnesses testifying that he "walked over there like he was throwing something." That same witness stated that the "dude acted like he was going to take off from the scene." Another witness did not see McClelland run toward the woods, but testified that he was pacing near the woods and never approached Learmonth's car or tried to help Learmonth. McClelland testified that he ran away from the van because he thought it was on fire. He further testified that he returned to retrieve his cell phone when he saw that the van was not on fire; that he called his supervisor and not 911 because another person was already calling 911; and that he did not approach Learmonth's car because emergency personnel were on the way.

Two accident reconstruction experts also testified at length concerning liability. Learmonth's expert opined that, based on the measurements taken of the damage to the vehicles and assuming that their final resting place was in the northeast quadrant, Learmonth's car was struck while traveling north on Highway 15 by the larger Sears van traveling east on Highway 485. In his view, it was not plausible that both vehicles would come to rest in the northeast quadrant of the intersection if the larger van, traveling south, struck the car at

3

a high rate of speed when the car ran a stop sign traveling east. Instead, the van would have pushed the car to the south side of the intersection. Sears' expert testified that there was not enough physical evidence to determine the sequence of events or the cause of the collision.

Learmonth was seriously injured in the accident, suffering, among other things, traumatic brain injury with loss of consciousness; multiple fractured bones in her pelvic area which required a permanent screw; a broken collarbone; acute post-hemorrhagic anemia; and puncture wounds and lacerations to her face and shoulder. She was hospitalized for five days after the accident, confined to a wheelchair for two months, and on crutches for several weeks after that. Her fractures have healed, but Learmonth testified at trial that she continues to experience chronic pain in her lower back and pain from nerve damage in her left leg. She receives epidural steroid injections one to three times a year for pain alleviation, and will continue to do so for the next ten to fifteen years. She testified that the injections provide some relief for her leg pain, but very little relief for her back pain.

Learmonth also presented evidence that she suffered from short- and long-term memory loss, headaches, blackouts, and depression, although not all of these ailments were documented in her medical records. Her ex-husband testified that the accident—and Learmonth's ensuing physical and emotional problems—were the cause of their divorce. Evidence was also offered of Learmonth's decreased capacities for housecleaning, playing with her son, and taking care of herself.

Learmonth has held three jobs since the accident—waitressing at a restaurant, selling clothes at a retail store, and working as a bank teller. She left the restaurant because she could not perform the tasks required due to physical and emotional problems; her injured collarbone prevented her from lifting the server trays over her head, as required, while the emotional problems

No. 09-60651

manifested themselves in frequent crying. She left her retail job because it entailed too much standing, and left the teller job on her doctor's recommendation due to the pain she experienced from sitting and standing for long periods of time.

At the conclusion of the trial, the jury found Sears liable for Learmonth's injuries and awarded her $4 million in compensatory damages. The verdict on its face did not divide the award into separate categories, but the parties agree that the total award can be divided as follows: approximately $1.2 million for lost earnings; $573,000 in past and future medical expenses; and approximately $2.2 million in non-economic damages.

Sears moved for a new trial, arguing that Learmonth's counsel made improper comments during opening and closing statements, that the district court admitted improper evidence at trial, and that the jury's verdict was so exaggerated that it reflected bias, passion, and prejudice. Sears moved in the alternative for remittitur on the grounds that the award exceeded both the bounds of reasonable recovery for injuries of the type Learmonth sustained, as well as Mississippi's statutory cap of $1 million on non-economic damages, MISS. CODE ANN. § 11-1-60(2)(b) (Supp. 2010). Learmonth argued, for her part, that Section 11-1-60(2)(b) violates the Mississippi constitution.

The district court denied Sears' motion for a new trial, but rejected Learmonth's challenge to the constitutionality of Section 11-1-60(2)(b) and remitted the non-economic damages award to $1 million. This appeal and cross-appeal followed.

## II.  DISCUSSION

### A.    Motion for New Trial

Sears argues that the district court erred in denying a new trial based on improper comments made by plaintiff's counsel during the opening and closing statements, and the admission of irrelevant and prejudicial evidence at trial. "A

No. 09-60651

new trial will not be granted based on trial error unless, after considering the record as a whole, the court concludes that manifest injustice will result from letting the verdict stand. We will reverse the trial court's denial of a motion for a new trial only when there is a clear showing of an abuse of discretion." *Foradori v. Harris*, 523 F.3d 477, 506–07 (5th Cir. 2008) (citations and internal quotation marks omitted).

*1.      Improper Comments by Plaintiff's Counsel*

The propriety of opening and closing arguments is a matter of federal trial procedure, and is therefore subject to federal rather than state law in a diversity case. *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 275 (5th Cir. 1998) (citations omitted). When an argument is challenged for impropriety or error, we review "the entire argument . . . within the context of the court's rulings on objections, the jury charge, and any corrective measures applied by the trial court." *Westbrook v. General Tire and Rubber Co.*, 754 F.2d 1233, 1238 (5th Cir. 1985). "Alleged improprieties may well be cured by an admonition or charge to the jury." *Id.*

Sears objects to the following statements, listed in the order in which they were made at trial:

1.    "Sears Roebuck has gone on about their business making money."

2.    "I'm not going to say what happened [concerning the missing service records from McClelland's laptop]. But I know, let me tell you, we live in a society where business can be cold and cruel and they do what they need to to survive. We know that."

3.    "And to me, that sun standing still [referring to McClelland's testimony that he left Bud Dees' home at 11:30 but could not explain what he was doing before the accident occurred almost two hours later] keeps him from being credible altogether with me."

6

No. 09-60651

4.    "Well, number one, I don't believe that he didn't know where he was [referring again to McClelland's testimony about the time gap].   I believe he made up that story about leaving—some story."

5.    "Does a credible person jump out of a car and run into the woods? Now, you may not believe he did. But W. L. Cleveland doesn't know anybody from Adam's house cat, happened to be standing out there and saw him run off to the woods. Candy Nance saw him running around everywhere.  The patrolman said he didn't, but the patrolman didn't get there until eight or ten minutes after the accident.  By then, he was back. That's one way to judge McClelland's credibility, I think."

6.    "And believe you me, some of this testimony wouldn't be undisputed if there was any way to dispute it.  I can promise you that.  Somebody would have been here to dispute it, because their resources are far more powerful than ours."

7.    "And I just—I talked to you about all the injuries that this woman had.  Man, how much more banged up can you get than to have all the bones broken and everything? How much more banged up can you get?  And what do they say?  Oh, she was all right in three months.  Well, they could have had her examined by their own doctor if they had wanted."

8.    "You know, there is such a contrast between Bud Dees and Candy Nance. I mean, I think Candy Nance is a great person. Don't ask me what I think of Bud Dees, because I can't use that kind of language."

9.    "And you know, everything is relative. Whether something is big or little, it's relative.  It depends.  To me or somebody else maybe, that's just so much money.  But what if you were in Lisa's place? You know?"

Sears' objection to the comments concerning witness credibility—statements 3, 4, 5, and 8 above—were not properly preserved for appeal because Sears neither objected to them during trial, nor raised them before the district court in post-trial proceedings.  Accordingly, we review those statements for plain error only and will reverse only if necessary to preserve a party's substantial rights.  See FED. R. CIV. P. 61; *Whitehead*, 163 F.3d at 276.

No. 09-60651

We have held that it is permissible for an attorney "to make statements that indicate his opinion or knowledge of the case . . . if the attorney makes it clear that the conclusions he is urging are conclusions to be drawn from the evidence." *United States v. Thompson*, 482 F.3d 781, 786 (5th Cir. 2007) (citation and internal quotation marks omitted). Statements 3 and 5 may fall within this description, whereas statements 4 and 8 are more questionable. Nevertheless, we do not find that the statements were so erroneous as to affect Sears' substantial rights. Indeed, the weight of the evidence showed an unexplained lapse of time between McClelland leaving Dees' home at 11:30 a.m. and the accident at 1:30 p.m., a key issue regarding liability given that Dees' home is on Highway 15 just a quarter of a mile north of the intersection where the collision took place.

The parties dispute whether we should consider comments 2 and 6. The district court sustained Sears' objection to those comments at trial, stating that they were matters outside of the record, but Sears did not identify them in its post-trial briefing until its reply brief in support of its motion for a new trial. We need not decide the issue, however, because even if we consider those comments together with the other remaining comments, they do not rise to a level of manifest injustice requiring reversal.

Sears argues that Learmonth's counsel used improper conscience-of-the-community arguments in statements 1, 2, and 6. A conscience-of-the-community argument is any "impassioned and prejudicial plea[] intended to evoke a sense of community loyalty, duty and expectation." *Westbrook*, 754 F.2d at 1239. Such an argument often invokes the parties' "relative popular appeal, identities, or geographical locations" to prejudice the viewpoint of the jury against an out-of-state corporation. *Guaranty Serv. Corp. v. Am. Emp'rs' Ins. Co.*, 893 F.2d 725, 729 (5th Cir. 1990). Sears also asserts that Learmonth's counsel argued a fact not in evidence in statement 7 and used an improper Golden Rule argument in

statement 9.  A Golden Rule argument suggests that the jury "place themselves in the plaintiff's position and do unto him as they would have him do unto them." *Whitehead*, 163 F.3d at 278 (citation and internal quotation marks omitted).

We agree with Sears that these comments were improper, but the impropriety was effectively cured by the court's sustainment of Sears' objections to each of the statements at trial, as well as by the court's jury charge, which instructed the jury that "[i]n deciding the facts of this case you must not be swayed by sympathy or bias or prejudice or favor as to either party";  that corporations and individuals have "equal standing in the community"; and that the lawyers' arguments are not evidence.  Moreover, "the failure of defense counsel to seek a mistrial suggests that any lingering prejudice from the improper comments was minimal." *United States v. Diaz-Carreon*, 915 F.2d 951, 959 (5th Cir. 1990).  The district court therefore did not abuse its discretion in denying Sears' motion for a new trial on the basis of these improper comments.

   2.   *Admission of Improper Evidence*

      a.   Testimony as to McClelland's Post-Accident Conduct

We review a district court's evidentiary rulings for abuse of discretion. *Abner v. Kansas City So. R.R. Co.*, 513 F.3d 154, 168 (5th Cir. 2008).  Sears argues that testimony pertaining to McClelland's post-accident conduct should have been excluded as irrelevant under Federal Rule of Evidence 402, or, in the alternative, as unfairly prejudicial under Rule 403.  Sears' motion in limine to exclude this evidence was sufficient to preserve the issue for appeal, even absent objection at trial.  *See Mathis v. Exxon Corp.*, 302 F.3d 448, 459 & n.16 (5th Cir. 2002).

   Evidence that is not relevant is inadmissible under Rule 402.  Relevant evidence is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." FED. R. EVID. 401.  The central issue as to

liability at trial was which driver, Learmonth or McClelland, was traveling east on Highway 485 and failed to stop at the stop sign.  To the extent that McClelland's testimony on his conduct immediately following the accident—whether he ran into the woods, threw something into the tree line, failed to render any assistance to Learmonth, or told another witness that there was nobody in Learmonth's vehicle—differed from that of other witnesses, it could render less credible his testimony as to his pre-accident conduct.  And as stated above, McClelland's whereabouts immediately before the accident was a critical question as to liability in this case.

Nor is this evidence unfairly prejudicial such that it should have been excluded under Rule 403.  "Rule 403 requires that the probative value of the evidence must be 'substantially outweighed by the danger of unfair prejudice' before the court may exclude the disputed evidence." *Baker v. Can. Nat'l/Ill. Cent. RR*, 536 F.3d 357, 369 (quoting FED. R. EVID. 403).  "Unfair prejudice is not satisfied by evidence that is 'merely adverse to the opposing party.' " *Id.* (quoting *Brazos River Auth. v. GE Ionics*, 469 F.3d 416, 427 (5th Cir. 2006)). While the jury may have had a negative reaction to the fact that McClelland did not approach Learmonth's car or attempt to help her, the jury was equally free to believe McClelland's testimony that he did not offer assistance because someone else at the scene had already called 911, and because emergency personnel were on the way.  And the danger—anticipated by Sears—that the jury "could mistakenly decide liability based on a misapprehension that McClelland was impaired and was acting to conceal some illegal substance" was countered by evidence offered by Sears at trial that McClelland did not appear to be impaired, and by the fact that no physical evidence was ever produced to support the lone witness's testimony that something had been thrown into the tree line.  The jury was also free to consider all the other testimony offered at trial regarding liability.  We cannot say that the district court abused its

discretion in determining that the danger of unfair prejudice did not substantially outweigh the probative value of this evidence.

Finally, Sears argues that evidence of McClelland's post-accident conduct was inadmissible under Rule 608(b), which provides that "specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness . . . may not be proved by extrinsic evidence." This argument, which was not raised below, is in any event without merit because Rule 608(b) limits only the use of evidence "designed to show that the witness has done things, *unrelated to the suit being tried*, that make him more or less believable per se." *United States v. Fusco*, 748 F.2d 996, 998 (5th Cir. 1984) (emphasis added). Here, as we have explained, McClelland's conduct is directly related to the suit being tried, and this argument is therefore inapposite.

b.      Demonstration of Learmonth's Injury

Sears also argues that Learmonth improperly demonstrated her injury in front of the jury. Sears presented a video during Learmonth's cross-examination showing her walking normally at the Neshoba County Fair a few months prior to trial. After testifying, Learmonth returned twice to the courtroom, walking "pretty slowly [and] limping noticeably," an action the district court characterized as "tantamount to testimony" that "at least some of the jury" observed. This action was brought to the parties' attention by the district court during a conference in chambers. The court commented, however, that "if you had any response to that, I wouldn't do anything about it; but it's just an unfortunate occurrence and it doesn't need to happen again."

Sears argues that the prejudicial effect of this demonstration was "obvious and incurable." Yet, as Learmonth notes, Sears did not raise any concerns about the demonstration during the conference in chambers, request to recall Learmonth to the stand, or request that any other curative actions be taken. Accordingly, our review is for plain error only. *Foradori*, 523 F.3d at 508.

No. 09-60651

In the overall context of the trial, we find that the plaintiff's demonstration did not affect Sears' substantial rights. Learmonth's gait would have been readily observed by the jury when she entered and exited the courtroom to testify. *Cf. Simeon v. T. Smith & Son, Inc.*, 852 F.2d 1421, 1426 (5th Cir. 1988) (holding that counsel's comments on plaintiff's use of cane did not require a new trial, because "[t]he jury no doubt had observed [plaintiff's] hobbled gait as he took the witness stand" and "[a]ny additional impact on the jury as it watched [plaintiff] walk to the chalkboard was not seriously prejudicial"). Furthermore, the jury was free to credit the video evidence presented by Sears, which showed Learmonth walking in a normal manner. We therefore conclude that the district court did not abuse its discretion in denying a new trial on this basis.

## B.  Excessiveness of the Jury Award

Sears next contends that the $1.2 million award for lost earning capacity and the $1 million post-statutory remittitur award for non-economic damages were contrary to the great weight of the evidence and so exceed the bounds of reasonable recovery that a new trial or remittitur is required.[1] Although the verdict did not distinguish the amount of the jury's award for each category of Learmonth's damages, the district court concluded—and the parties do not challenge—that the award was comprised of $90,098 for past medical expenses, $483,510 for future medical expenses (reduced to net present value), and $1,207,486 for loss of earning capacity, with the remaining $2,218,905 constituting non-economic damages.[2] The district court reduced the non-economic damages to $1 million pursuant to Mississippi's statutory cap on non-economic damages, Miss. Code Ann. § 11-1-60(2)(b).

---

[1] Sears does not challenge the reasonableness of the award for past and future medical expenses.

[2] We note that the sum of these numbers is $1 short of the total verdict of $4 million.

12

No. 09-60651

In a diversity case, we apply the new trial or remittitur standard according to the forum state's law controlling jury awards for excessiveness. *Foradori*, 523 F.3d at 497 (citing *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 419, 434 (1996)).  Our review under that standard is for abuse of discretion only, *id.* at 497–98, and "[w]e must give the benefit of every doubt to the judgment of the trial judge."  *Id.* at 498 (quoting *Gasperini*, 518 U.S. at 438–39) (internal quotation marks omitted).

Mississippi's statutory standard for granting a new trial or remittitur provides, in relevant part:

> The supreme court or any other court of record in a case in which money damages were awarded may overrule a motion for new trial or affirm on direct or cross appeal, upon condition of an additur or remittitur, if the court finds that the damages are excessive or inadequate for the reason that the jury or trier of the facts was influenced by bias, prejudice, or passion, or that the damages awarded were contrary to the overwhelming weight of credible evidence.

MISS. CODE. ANN. § 11-1-55 (Supp. 2010).  We therefore review the testimony and exhibits presented to the jury at trial to determine whether the district court abused its discretion in determining that the damages awarded were not "contrary to the overwhelming weight of credible evidence."

1.   *Loss of Earning Capacity*

Learmonth presented evidence to support a determination of a one hundred percent loss of earning capacity.  Her pain management physician determined that Learmonth had "reached the point where she can no longer hold down a job," and that he planned to take her off of work "due to the severity of her symptoms including the mechanical back pain and the nerve injury pain in her left leg or lower extremity."  These injuries affect her ability to work because she cannot sit or stand for any long periods of time.  He also opined that

No. 09-60651

Learmonth was a reasonable candidate for long-term disability and that she would be restricted from work "indefinitely."

Learmoth's vocational rehabilitation counselor also testified that she would not be able to return to competitive employment, based on the fact that there were no jobs that would meet her limitations in sitting and standing. And although Sears repeatedly emphasized that there were no limitations on Learmonth pursuing her education and thereby increasing her employment potential, her vocational counselor pointed out that any further education Learmonth obtained would not increase her tolerance for sitting and standing, and was thus irrelevant to the limitations that kept her from working.

Sears relies heavily on the fact that no doctors have placed any physical restrictions or limitations on Learmonth, and that her treating physician said that he would not restrict her from performing jobs within her functional capacity and pain limitations. Sears points out that Learmonth worked at three different jobs after the accident under the care of her doctors. Although Learmonth did work at three jobs, it is undisputed that she had to leave all three jobs because of her physical and emotional pain and discomfort. Learmonth's restaurant employer testified that she could not physically perform waitressing duties, which involved carrying heavy loads, and that she was emotionally unable to perform the lighter work of hostessing. Learmonth described "real bad pains" in her lower back associated with the sitting and standing in her job as a bank teller, even though she was allowed to alternate sitting or standing as often as she liked. Learmonth's supervisor at the bank testified that Learmonth constantly readjusted her position, trying to get comfortable, and her doctor ultimately advised her to stop working there because of her discomfort. Learmonth also testified that she could not continue her retail job because of the constant standing and an inability to sit down at the job site. She has to lay

14

No. 09-60651

down several times a day to help with the pain, and she takes a wide variety of medication on a daily basis.

Based on the assumption that Learmonth could not sustain competitive employment, and that she had suffered a fifty percent reduction in her ability to perform household services for herself and her family, Learmonth's expert economist opined that the net present value of her future earnings was approximately $1.2 million.  This number was based in part upon a $32,000 yearly income, an average between the annual income of a high school graduate and that of a person with an associate degree.  The evidence at trial showed that Learmonth had just begun a nursing program at a junior college and had been a motivated high school student.

Ultimately, the question whether Learmonth suffers so much pain on a daily basis that she is prevented from working again is a factual question.  Upon reviewing the evidence on both sides, we are convinced that the jury's verdict as to loss of earning capacity was not "contrary to the overwhelming weight of credible evidence."  Accordingly, we refuse to disturb the jury's verdict on this issue.

2.    *Non-Economic Damages*

In reviewing the excessiveness of the non-economic damages award, we consider the post-remittitur amount of $1 million, rather than the $2.2 million amount originally awarded by the jury.[3]  *Salinas v. O'Neill*, 286 F.3d 827, 830 n.3 (5th Cir. 2002); *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 487 (5th Cir. 2001).  There is no doubt that Learmonth suffered serious injuries in the accident.  Among these were a traumatic brain injury with loss of consciousness, multiple fractures to the pelvis, a fractured clavicle, acute post-hemorrhagic anemia, a collapsed lung, and puncture wounds and lacerations to her face and shoulder.

---

[3] We note that, in this case, review of a $2.2 million damages award would not change the result.

15

At the emergency room, she had blood coming out of both ears and out of the side of her head, and was moaning with pain despite the administration of morphine.

After being air-lifted from the local emergency room to University Medical Center in Jackson, Mississippi, a surgeon performed a sacroiliac joint fusion, in which he implanted a large and permanent screw across her pelvis in order to stabilize it. Learmonth was at the hospital for five days, confined to a wheelchair for two months and then was on crutches for several weeks. For several weeks after her discharge, her husband had to administer shots in her stomach in order to prevent blood clots. She was unable to bathe herself, change her clothes, or use the bathroom on her own.

Evidence was presented to show that Learmonth still suffers from multiple injuries, including a herniated disk, nerve injuries to the left leg, degenerative osteoarthritis in her back, chronic headaches, depression, and memory loss. After receiving her epidural injections, Learmonth has no feeling from her waist down to her toes for approximately six hours, during which time she cannot use the bathroom on her own. She has great difficulty sleeping due to pain, and frequently awakens through the night screaming and crying. It takes her approximately fifteen to thirty minutes to position herself to get out of bed each morning.

Learmonth was nineteen years old at the time of the accident, and she was described as outgoing, social, and active. Following the accident, she was described as often angry, depressed, and irritable. Her ex-husband testified that the physical and emotional strain placed on their marriage following the accident was the cause of their divorce. The accident has also affected Learmonth's relationship with her son, with whom she can no longer do many of the things she once did. Learmonth's mother testified that Learmonth's son, being too young to understand Learmonth's limitations, believes that she is simply lazy.

No. 09-60651

Learmonth will continue to require medical care for the remainder of her life. While she can no longer expect any physical improvement, she will require regular clinic visits, routine epidural steroid injections, usage of a number of medications, and physical therapy in order to control her pain. According to expert testimony, she has a life expectancy of 82 years, which means that she will continue to experience pain and suffering for another sixty years. Her pain management physician testified that her pain may actually worsen over time, and more serious measures—such as the implantation of a spinal cord stimulator—may be necessary in the future.

Sears argues that Learmonth was doing well within months after the accident and that whatever long-term symptoms she continues to experience are well-controlled by medication. This is based upon the medical records of her surgeon, which reflect that Learmonth reported a month and a half after her surgery that she did not have any complaints outside of a little discomfort with prolonged sitting, and that she was "doing well" and "not having any problems." Her pain management physician's medical records show that Learmonth reported that the epidural steroid injections help "tremendously" with her pain and provide her with "excellent pain relief" for many months, albeit they do not relieve pain in her lower back. Learmonth's neurologist's records show that Learmonth reported her headaches to be infrequent, and that the headaches and memory problems are both well controlled by medication.

The extent of Learmonth's pain and suffering is a factual question on which the jury heard multiple witnesses and received conflicting evidence. Upon reviewing this evidence ourselves, we are unable to say that the jury's verdict as to non-economic damages was "contrary to the overwhelming weight of credible evidence." Accordingly, we refuse to disturb the award.

17

No. 09-60651

3.    *The Maximum Recovery Rule*

Sears argues that this circuit's "maximum recovery rule" supports its motion for remittitur in the alternative.[4]   Under the rule, "we remit damage awards that we find excessive to the maximum amount the jury could have awarded." *Salinas*, 286 F.3d at 830.   Although each case must be evaluated on its own facts, our evaluation of what a jury could have awarded is informed by awards for similar injuries in Mississippi.   *See id.* at 831.

Sears directs our attention to two Mississippi decisions that it contends are most similar to this case.   In *Goodyear Tire & Rubber Co. v. Kirby*, — So. 3d —, 2009 WL 1058654 (Miss. App. Apr. 21, 2009) (en banc), *rh'g denied* (Dec. 15, 2009), *cert. dismissed*, 36 So.3d 455 (Miss. Jun 24, 2010),[5]   the jury awarded a plaintiff approximately $1.75 million in damages, of which approximately $1.4 million was for non-economic damages, for severe injuries resulting from a car accident.[6]   *Id.* at *24–25.   Although his initial injuries were similar to and at least as severe as Learmonth's, the plaintiff in *Goodyear* had a different recovery trajectory.   Doctors testified to his brain damage and to a thirty-seven percent impairment to his body as a whole, as well as to continuing pain in his left knee and ankle and future pain in his lower back as a side result of post-accident surgery.   At the time of trial, however, he held a full-time job at Nissan making

[4] Because both parties proceed without objection to address the Fifth Circuit's maximum recovery rule after applying the forum state's standard pursuant to *Gasperini*, we do so as well.

[5] We do not rely on unreported opinions in applying the maximum recovery rule.  *See Lebron v. United States*, 279 F.3d 321, 326 (5th Cir. 2002) ("We decline to use unreported decisions as benchmarks for this purpose.").  However, because *Goodyear*'s citation indicates that the decision will be published in the Southern Reporter, we address it here.

[6] The case was filed on November 20, 2002, and thus the non-economic damages award was not subject to the Mississippi statutory cap, which only applies to cases filed after September 1, 2004.  MISS. CODE ANN. § 11-1-60(2)(b).  The remaining $350,000 was for past and future medical damages; no economic damages were awarded.

$20 an hour. *Id.* at \*25. He testified that he considered himself fully recovered, and represented on a job application and health questionnaire nine months after the accident that he was completely recovered, released from all doctors, had no disabilities, and was willing to travel for the job and to work overtime and weekends. *Id.* at \*24. Learmonth, on the other hand, will require treatment for pain for the remainder of her life and suffers from debilitations—such as the inability to sit or stand for any length of time—from which the plaintiff in *Goodyear* does not suffer. Perhaps most significantly, Learmonth cannot work at all, a harm that goes beyond the economic damage for which she was separately compensated.

In *Wells Fargo Armored Service Corp. v. Turner*, 543 So. 2d 154 (Miss. 1989), the Mississippi Supreme Court remitted a damages award from $3,416,090 to $850,000, of which $402,000 was for loss of income. *Id.* at 160. The plaintiff in that case suffered serious injuries in a car accident, most of which healed completely. *Id.* at 159. His left leg remained partially impaired, however, and he took Motrin for chronic pain caused by calcium deposits and arthritis that developed as a result of his fractured pelvis. *Id.* Like Learmonth, he was totally economically disabled as a result of his injury, in light of his education and experience and the job market in his area. *Id.* However, there are several factors that render *Turner* unsuitable for comparison. First, the relative severity of Learmonth's pain and permanent injuries—which require epidural injections, doses of multiple medications, and ongoing medical treatment—stands in contrast to the anti-inflammatory medication taken by the plaintiff in *Turner*. The plaintiff in *Turner* was also older than Learmonth at the time of his injury, and the award was rendered twenty years before this case. Furthermore, loss of earnings is a calculation unique to each person's age, education, experience, and other factors, and both Learmonth and the plaintiff

in *Turner* presented expert testimony as to the net present value of their respective lifetime income streams in support of their economic damages awards.

"Because the facts of each case are different, prior damages awards are not always controlling; a departure from prior awards is merited 'if unique facts are present that are not reflected within the controlling caselaw.'" *Lebron v. United States*, 279 F.3d 321, 326 (5th Cir. 2002) (quoting *Douglass v. Delta Air Lines, Inc.*, 897 F.2d 1336, 1339 (5th Cir. 1990)).  Because this case presents unique facts for which there are no controlling cases in the relevant jurisdiction, the maximum recovery rule is not implicated and we refuse to substitute our judgment for that of the jury.  *Vogler v. Blackmore*, 352 F.3d 150, 158 (5th Cir. 2003).

## III.  CONSTITUTIONALITY OF STATUTORY CAP ON DAMAGES

On cross-appeal, Learmonth argues that Section 11-1-60(2)(b) of the Mississippi Code violates the Mississippi Constitution.  This is an important question of state law, determinative of the non-economic damages issue in this case, for which there is no controlling precedent from the Supreme Court of Mississippi.  We therefore certify the question to the Supreme Court of Mississippi.

> CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT TO THE SUPREME COURT OF MISSISSIPPI, PURSUANT TO RULE 20 OF THE MISSISSIPPI RULES OF APPELLATE PROCEDURE.

> TO THE SUPREME COURT OF MISSISSIPPI AND THE HONORABLE JUSTICES THEREOF:

> **A.    Style of the Case**

> The style of the case in which this certification is made is *Lisa Learmonth v. Sears, Roebuck and Co.*, No. 09-60651, in the United States Court of Appeals for the Fifth Circuit.  The case is on appeal from the United States District Court

for the Southern District of Mississippi.   Federal jurisdiction is based on diversity of citizenship.

## B.   Statement of Facts

Appellant Lisa Learmonth was seriously injured in a car accident at the intersection of Mississippi State Highways 15 and 485.  The collision involved Learmonth's car, which she was driving, and a Sears, Roebuck and Company ("Sears") van driven by a Sears employee.  Both liability and damages were contested at trial.  At the conclusion of the trial, the jury found Sears liable for Learmonth's injuries and awarded her $4 million in compensatory damages. The verdict on its face did not divide the award into separate categories, but the parties agree that the total award can be divided as follows: approximately $1.2 million for lost earnings; approximately $573,000 in past and future medical expenses; and approximately $2.2 million in non-economic damages.

Upon Sears' motion, the district court remitted the non-economic damages award to $1 million pursuant to Section  11-1-60(2)(b) of the Mississippi Code, which imposes a statutory cap of $1 million on non-economic damages.[7]  On appeal, Learmonth renews her arguments below that Section 11-1-60(2)(b) violates the right to trial by jury under Mississippi Constitution article 3, section 31, and also violates the separation of powers clauses in article 1, sections 1 and 2. Amicus for Learmonth further argues that Section 11-1-60(2)(b) violates the

---

[7] Section 11-1-60(2) provides in pertinent part:

(b) In any civil action filed on or after September 1, 2004, other than those actions described in paragraph (a) of this subsection, in the event the trier of fact finds the defendant liable, they shall not award the plaintiff more than One Million Dollars ($1,000,000.00) for noneconomic damages.

It is the intent of this section to limit all noneconomic damages to the above.

(c) The trier of fact shall not be advised of the limitations imposed by this subsection (2) and the judge shall appropriately reduce any award of noneconomic damages that exceeds the applicable limitation.

guarantee of access to the courts in article 3, section 24 of the Mississippi Constitution. The State of Mississippi, which intervened in support of Sears to defend the constitutionality of the statute, argues that there is no "palpable conflict" between a jury's assessment of damages and the legislature's determination of the legal consequences of that assessment.

### C.   Question Certified

We hereby certify, on Sears' unopposed motion,[8] the following determinative question of law to the Supreme Court of Mississippi:   Is Section 11-1-60(2) of the Mississippi Code, which generally limits non-economic damages to $1 million in civil cases, constitutional?

This court disclaims any intention or desire that the Supreme Court of Mississippi confine its reply to the precise form or scope of the question certified. If the Supreme Court of Mississippi accepts this certification, the answer provided by that court will determine the issue on cross-appeal in this case. The record and copies of the parties' briefs are transmitted herewith.

### IV.   CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court insofar as it denied a new trial and certify the question regarding the constitutionality of Mississippi's statutory cap on non-economic damages on cross-appeal to the Mississippi Supreme Court.

---

[8] In her brief to this court, Learmonth opposed certification on the ground that *Double Quick, Inc. v. Lymas*, — So. 3d —, 2010 WL 3706443 (Miss. Sept. 23, 2010), which was then pending before the Supreme Court of Mississippi, raised an identical challenge to the constitutionality of Section 11-1-60(2)(b). *Id.* at *5. At oral argument, Learmonth's counsel indicated that, given the fact that the Supreme Court of Mississippi did not reach the constitutional question in *Double Quick, see id.* at *8, Learmonth is no longer opposed to certification.