# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 8, 2024

Lyle W. Cayce
Clerk

No. 21-10805

———————

DAVID M. CLAPPER, *individually*; ATLANTIC MIDWEST, L.L.C., *a Michigan limited liability company*; ATLANTIC XIII, L.L.C., *a Michigan limited liability company*,

*Plaintiffs—Appellants*,

*versus*

AMERICAN REALTY INVESTORS, INCORPORATED, *a Nevada corporation*; AMERICAN REALTY TRUST, INCORPORATED, *a Georgia corporation*; PILLAR INCOME ASSET MANAGEMENT, INCORPORATED, *a Nevada Corporation*; PRIME INCOME ASSET MANAGEMENT, INCORPORATED, *a Nevada corporation*; PRIME INCOME ASSET MANAGEMENT, L.L.C., *a Nevada limited liability company*; EQK HOLDINGS, INCORPORATED, *a Nevada corporation*; BASIC CAPITAL MANAGEMENT, INCORPORATED, *a Nevada corporation*; BRADFORD PHILLIPS, *Independent Executor of* GENE PHILLIPS WILL and ESTATE,

*Defendants—Appellees*.

———————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:14-CV-2970

———————————————————

Before RICHMAN, *Chief Judge*, and HIGGINBOTHAM and ELROD, *Circuit Judges*.

No. 21-10805

Per Curiam:

David Clapper sued American Realty Investors, Inc., and other defendant entities, claiming that they transferred assets to avoid paying a judgment from a previous lawsuit in violation of the Texas Uniform Fraudulent Transfers Act (TUFTA) and the doctrine of alter ego liability. The jury rendered a verdict in favor of the Defendants on all claims. Clapper appealed, contending that Defendants' counsel made numerous improper and highly prejudicial statements in closing argument. Because we agree that the Defendants' counsels' closing argument irreparably prejudiced the fairness of the trial, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.

I

This appeal is part of a long-running series of litigation between the parties. In 1999, the Defendants sued David Clapper for breaching an agreement regarding the acquisition and management of various apartment complexes. In 2004, the Defendants prevailed at trial, and Clapper appealed. We reversed and remanded. In 2011, Clapper prevailed in a second trial and was awarded over $70 million in damages. Finally, in 2016, following an appeal of the second trial, the district court again entered final judgment in Clapper's favor, this time for more than $50 million.

In 2014, Clapper filed the instant lawsuit, claiming that a series of transfers beginning in 2010, on the eve of the second trial, violated TUFTA. For example, he claimed that one of the Defendants "exercised total domination and control" over two other Defendants, and that assets (mostly stock) were transferred between the Defendants with the intent to "hinder, delay, or defraud" his efforts to collect on the judgment in violation of TUFTA. *See* Tex. Bus. & Com. Code § 24.001. Clapper also claimed that one of the Defendants violated Georgia and Nevada alter ego law because it

had served for years as the alter ego of two of the other Defendants, and that one individual, Gene Phillips, served as the alter ego of two of the Defendants.

After the judgment was entered in the second trial, Clapper filed a Turnover Motion to aid in collection.  Shortly before the hearing on this motion, one of the Defendants filed for bankruptcy in Nevada, staying the turnover proceedings. The Nevada bankruptcy proceedings were dismissed for improper venue, and that same entity then filed for bankruptcy in Georgia.  The case was transferred, because of improper venue, to the Northern District of Texas, where it was dismissed in 2014.  The instant claim followed.  Trial on Clapper's TUFTA and alter ego claims took place in May 2021.  The jury ruled for the Defendants on both claims.

After the verdict, Clapper filed motions for judgment as a matter of law and for a new trial.  The Defendants moved for judgment on the verdict. On July 14, 2021, the district court denied Clapper's motions and granted the Defendants' motion for a judgment on the verdict.

Clapper appealed, claiming that a new trial is warranted because: (1) the Defendants' attorneys made prejudicial remarks during closing argument; (2) the district court improperly excluded evidence; (3) the jury instructions were deficient; and (4) the jury's verdict was against the weight of the evidence.[1]  The Defendants contest each of these arguments and maintain that they are entitled to judgment as a matter of law.

---

[1] Because we agree with Clapper's first argument, we do not address whether the district court improperly excluded evidence, whether the district court made material errors in the jury instructions, and whether the jury's verdict was against the weight of the evidence.

We review a district court's denial of a motion for a new trial for abuse of discretion. *Fornesa v. Fifth Third Mortg. Co.*, 897 F.3d 624, 627 (5th Cir. 2018).

## II

## A

We start, and end, with Clapper's first argument. A new trial is warranted when "improper closing argument irreparably prejudices a jury verdict." *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 509 (5th Cir. 2012) (quoting *Nissho-Iwai Co., Ltd. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 619 (5th Cir. 1988)). A jury verdict may be irreparably prejudiced in several ways.

For example, a new trial may be warranted when one party makes an "unsupported, irresponsible attack on the integrity of opposing counsel" or relies on "the identity of counsel as the basis" for its argument. *Bufford v. Rowan Cos., Inc.*, 994 F.2d 155, 157–59 (5th Cir. 1993) (holding that a new trial was warranted because defense counsel implied that plaintiff's selection of legal counsel was indicative of a "copycat" lawsuit); *see also United States v. Barnes*, 979 F.3d 283, 299 (5th Cir. 2020) ("Attacking defense counsel was unwarranted, unprovoked, and irrelevant. The district court therefore correctly concluded that the prosecution's remarks during rebuttal were improper."). A new trial may also be warranted when counsel, in closing argument, argues the existence of material facts that are "false or without basis in the record." *In re Isbell Recs., Inc.*, 774 F.3d 859, 872 (5th Cir. 2014); *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 285 (5th Cir. 1975).

Appeals to local bias may also sufficiently prejudice the jury to warrant a new trial. *Whitehead v. Food Max*, 163 F.3d 265, 276–78 (5th Cir. 1998) (holding that a new trial was warranted because counsel made repeated references to the fact that the defendant corporation was a national, and not

a local, corporation, and had its principal place of business in another state). We have also held that a new trial may be warranted when counsel interjects personal opinion into argument. *United States v. Delgado*, 672 F.3d 320, 336 (5th Cir. 2012) (en banc) ("The prohibition on giving personal opinions prevents a prosecutor from giving the jury the impression that he has superior knowledge of the facts based on private information not admitted into evidence.").

In *Learmonth v. Sears, Roebuck & Co.*, we examined the impropriety of "conscience-of-the-community arguments," which we described as "impassioned and prejudicial pleas intended to evoke a sense of community loyalty, duty and expectation." 631 F.3d 724, 732 (5th Cir. 2011) (alteration omitted) (quoting *Westbrook v. Gen. Tire & Rubber Co.*, 754 F.2d 1233, 1238–40 (5th Cir. 1985)). These arguments evoke local biases that "prejudice the viewpoint of the jury against an out-of-state" party. *Id.* (quotation marks omitted) (quoting *Guar. Serv. Corp. v. Am. Emps'. Ins. Co.*, 893 F.2d 725, 729 (5th Cir.)). We have also remanded for a new trial when defense counsel painted the plaintiff as "a woman who had flouted respect for marriage vows, who had used illegal drugs, and who was trying to take advantage of the good people of rural northern Mississippi." *Hall v. Freese*, 735 F.2d 956, 960 (5th Cir. 1984).

By contrast, "expressive language and a bit of oratory and hyperbole in arguments" does not require a new trial. *United States v. Boyd*, 773 F.3d 637, 645 (5th Cir. 2014) (quotation marks and citations omitted) (affirming where prosecutor remarked that the defendant's legal theory was "one of the most preposterous things I've ever heard in my life" and "one of the dumbest things I have ever heard"). However, legitimate "oratory" and "hyperbole" can only extend so far. If closing argument crosses the line to impermissible prejudice, a new trial may be appropriate.

No. 21-10805

To determine if a new trial is warranted, the statements must be examined collectively and in the specific context of the trial at issue. *Nissho-Iwai Co., Ltd.*, 848 F.2d at 619 ("We examine the propriety of closing argument by reviewing the entire argument 'within the context of the court's rulings on objections, the jury charge, and any corrective measures applied by the trial court.'"). If the "tactics" used during trial, taken together, "tarnish the badge of evenhandedness and fairness that normally marks our system of justice," then a new trial is warranted. *Bufford*, 994 F.2d at 158. This is especially the case when, as here, those "tactics" are used during closing argument, which often leaves an especially powerful impression on the jury. *See United States v. Okoronkwo*, 46 F.3d 426, 437 (5th Cir. 1995) ("[W]e do not wish to underestimate the value of closing argument, as it is the last impression a defendant makes upon the jury.").

B

Here, the Defendants were represented at trial by Stephen A. Khoury and C. Gregory Shamoun. Together, they employed nearly every category of what we have previously held to be improper closing argument. These improper and highly prejudicial statements, examined in the aggregate and in context, demonstrate the need for a new trial.

To start, they launched a barrage of personal attacks against Andrew W. Mychalowych, Clapper's counsel. For example, while beginning his closing argument, Shamoun threw a box of tissues at Mychalowych, stating "I know y'all have a potentiality of crying, y'all might need Kleenex during my [closing.]" During his closing, Shamoun said that if Mychalowych had accused him of perjury in the street rather than the courtroom he would have "kicked his butt." He then declared, "I don't care if I was half blind and half-lame, I would have found the strength to whoop his a--." He continued, explaining that if Mychalowych were his child, he would have "spanked"

6

him for asking so many leading questions.    Shamoun also accused Mychalowych of attempting to "hide evidence" and called him an "embarrass[ment] for the profession."    Shamoun suggested that Mychalowych must think that each juror was "an idiot."    He called Mychalowych's actions "low class," "classless," "ruthless," and "disgusting."  Finally, Shamoun insisted that:

> [Mychalowych] defied this judge. He defied the instructions of the Judge. . . . He treated us all here with disrespect.  He tried to hide evidence. . . . Judge had to scold him.  I have never seen anything like this in the over 30 years that I have practiced in this town.  Never have I seen what y'all witnessed.  I am embarrassed for the profession, ma'am.  I'm embarrassed.

Khoury, for his part, implied that Clapper had paid a witness to testify, and referred to one of Clapper's expert witnesses as a "paid prostitute from Michigan."  Khoury called Mychalowych a "dishonest broker" who was "deceitful and deceptive."  After calling Mychalowych dishonest, Khoury went on to say that "where I come from, we don't listen to another germ that comes out of that person's mouth."

The Defendants provide a series of excuses for these remarks.  They argue that Shamoun's claim that he would have "kicked [Mychalowych's] butt" was "hyperbolic" and directed at Mychalowych's accusation of perjury.  The accusation of perjury also purportedly prompted Shamoun to call Mychalowych's actions "low class," "classless," "ruthless," and "disgusting."    And the "spanking" remark was in response to Mychalowych's repeated attempts to ask leading questions. According to the Defendants, the suggestion that Mychalowych attempted to hide evidence was not dishonest because the court issued a curative instruction regarding Mychalowych's misrepresentation of an exhibit.  This is what, Defendants argue, led Shamoun to say that he was an "embarrass[ment] for the

profession." Defendants also emphasized that Khoury immediately walked back his comment that Clapper paid a witness, calling it "not a reasonable deduction from the evidence." Further, they argue that the comments do not warrant reversal because the court admonished Khoury for twice referring to Clapper's witness as a "paid prostitute." Likewise, the district court also instructed the jury to focus only on evidence, not "lawyer argument."

To the extent these excuses justify counsels' remarks, they do not account for the personal attacks made against Clapper. Shamoun characterized Clapper as a "billionaire" with a 70-foot yacht who was going after the estate of defendant Gene Phillips, who had recently died and left behind a widow and six children. Khoury called Clapper a "financial pimple." Shamoun suggested that Clapper's case was "insulting to everybody's intelligence" and "insulting to everybody's position as a juror."

Shamoun also attempted to discuss during closing argument matters not before the jury by implying that the trial judge—whom he called "[t]he man up there with the robe"—had ruled that there was insufficient evidence for Clapper's alter ego claim, even though it had yet to be submitted, and that a contrary finding would be "unheard of."

Both Shamoun and Khoury attempted to appeal to the jury's local bias as well. Together they mentioned several times that Clapper was from Michigan, while also suggesting that people from Michigan have lower moral standards.

Finally, Shamoun injected his personal opinion into trial when he stated that he hoped that anyone who could drum up a lawsuit like Clapper's would "understand that they are going to meet their maker," and that Clapper is not credible: "He can cry, cry like he did in the first trial, he can

cry like he did here.  I'm not going to tell you, I don't like him because it don't matter what I do or what I don't. But he's not a credible person."

There is no doubt that these remarks, considered collectively, extend far beyond permissible hyperbole or "expressive language," and were designed to bias the jury against Clapper and his counsel.  Khoury's and Shamoun's improper statements pervaded closing argument.  As noted above, they employed nearly every type of improper argument identified by our court, including highly improper and personal attacks against opposing counsel, remarks about Clapper's wealth, a discussion of matters not in the record, insinuations that Clapper had lower moral standards because he was from Michigan, and suggestions of Clapper's bad motives through counsels' opinion.    These attacks "unquestionably tarnish[ed] the badge of evenhandedness and fairness that normally marks our system of justice." *Bufford*, 994 F.2d at 158.[2]  And they extend far beyond mere "oratory" or

---

[2] The Defendants assert that Clapper must meet a higher bar here for a new trial because he failed to move for a mistrial in district court. *See Shipman v. Cent. Gulf Lines, Inc.*, 709 F.2d 383, 388 (5th Cir. 1983) (citation omitted) (holding that arguments that are not objected to are reviewed only in "exceptional cases where the interest of substantial justice is at stake").  The serious nature of the argument in this trial, however, indicates that substantial justice requires a new trial, like in *Edwards*.  There, we held that the interest of substantial justice demanded a new trial because counsel brought forth in closing argument damaging facts that were not in the record and made several emotional appeals regarding the death of a litigant. *Edwards*, 512 F.2d at 284–86; *see also Alaniz v. Zamora-Quezada*, 591 F.3d 761, 778 (5th Cir. 2009) ("Improper argument may be the basis for a new trial where no objection has been raised only where the interest of substantial justice is at stake." (alteration adopted) (citation and quotation marks omitted)); *Whitehead*, 163 F.3d at 278 (reversing judgment based on improper closing argument where appellant "fail[ed] to object to almost all of the statements now challenged").

The Defendants also argue that a new trial is not warranted because this court is not required to consider unobjected to arguments. *Baisden*, 693 F.3d at 509.  This is incorrect.  We may grant a new trial, even when counsel fails to object in closing, if the closing argument "affect[s] the substantial right of the parties" by "seriously prejudice[ing] [Clapper's] right to a fair trial . . . ." *Edwards*, 512 F.2d at 286.  Further, the

"hyperbole." *See Boyd*, 773 F.3d at 645; *see also Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 682 (Tex. 2008) (remanding for a new trial after concluding that criticizing defense counsel and referring to the Nazis was "designed to turn the jury against opposing counsel and his clients").

To be sure, we have often affirmed the denial of a motion for new trial where sparse prejudicial remarks, viewed in the context of the entire trial, were unlikely to inflame the passions of the jury. *E.g.*, *Learmonth*, 631 F.3d at 732; *Barnes*, 979 F.3d at 299. Though improper, the isolated remarks in those cases, when examined in the aggregate, did not affect the fairness of the trial. Not so here. In this case, repeated improper statements including attacks against opposing counsel, references to Clapper's wealth, matters not in the record, appeals to local bias, and suggestions of Clapper's bad motives, abandoned all "dignity, order, and decorum[,]" which we have described as the "hallmarks of all court proceedings in our country." *Farmer v.*

---

district court expressly directed the parties to forgo objections during closing argument, in favor of sidebar conferences.

Defendants argue that a new trial is not warranted because the district court issued curative instructions regarding the remarks and explained in its jury charge that argument from counsel is not evidence. The district court's two curative instructions and charge regarding counsels' remarks were not sufficient to overcome the severe prejudice resulting from the attorneys' statements. The district court attempted to remedy the situation by instructing Mychalowych that he was permitted to "return the favor" after Khoury made an insulting remark. This was not appropriate here. Shortcomings at closing argument can be particularly damaging to the judicial process because closing argument often has a strong impact on the jury as it is the last thing that it hears. *Okoronkwo*, 46 F.3d at 437. Two curative instructions along with sidebar conferences were not enough to ensure that the jury's verdict was not impermissibly prejudiced by counsels' remarks.

Finally, Defendants contend that their prejudicial remarks were harmless because Clapper failed to establish an essential element of his claim, the valuation of the disputed properties. However, the trial record is replete with both parties' valuation evidence. And Defendants previously made this argument in their motion for judgment as a matter of law, which the district court properly denied. This argument likewise fails.

No. 21-10805

*Strickland*, 652 F.2d 427, 437 (5th Cir. Unit B 1981) (quotation marks omitted) (quoting *Illinois v. Allen*, 397 U.S. 337, 343 (1970)).    These statements affected Clapper's "substantial rights" and warrant a new trial. *Edwards*, 512 F.2d at 286.

## III

Having resolved the issue before us, we turn briefly to comment on civility in the practice of law.  In the 1908 Canons of Professional Conduct—a precursor to the present-day Model Rules of Professional Conduct—the ABA stated that,

> Nothing operates more certainly to create or to foster popular prejudice against lawyers as a class, and to deprive the profession of that full measure of public esteem and confidence which belongs to the proper discharge of its duties than does the false claim . . . that it is the duty of the lawyer to do *whatever may enable him to succeed* in winning his client's cause.

Am. Bar Ass'n, Canons of Professional Ethics, Canon 15 (1908) (emphasis added).  Zeal for a client's cause, it continued, must be exercised "within and not without the bounds of the law." *Id.*

Despite the ABA's admonition, improper litigation tactics took hold. By 1935, the Supreme Court, describing the role of the prosecutor, counselled that while a lawyer "may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935).  Our late colleague Judge Thomas M. Reavley, while practicing in rural East Texas in the late 1940s, encountered lawyers who "would not hesitate to employ foul means to serve their purposes."  Thomas M. Reavley, *Rambo Litigators: Pitting Aggressive Tactics Against Legal Ethics*, 17 Pepp. L. Rev. 637, 639–40 (1990).  He specifically recalled that young lawyers "were verbally abused and even threatened with physical attacks[,]" promises for settlement were broken, and jury tampering ran rampant. *Id.* at 640–41.

Although the ABA twice drafted new model rules to guide professional conduct (once in 1969, and once in 1983), the late 1980s saw the rise of "Rambo" litigation tactics, a win-at-all-cost strategy that we described as bringing "disrepute upon attorneys and the legal system." *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1486 (5th Cir. 1990).

The U.S. District Court for the Northern District of Texas, the very court from which this appeal is taken, took one of the first steps to mandate civility in *Dondi Properties Corp. v. Commerce Savings & Loan Ass'n*, 121 F.R.D. 284, 287 (N.D. Tex. 1988) (en banc) (per curiam). In *Dondi*, the judges sitting *en banc* observed that "valuable judicial and attorney time" was being "consumed in resolving unnecessary contention and sharp practices between lawyers." *Id.* at 286. These ill-mannered "Rambo" tactics "threaten[ed] to delay the administration of justice and to place litigation beyond the financial reach of litigants." *Id.* In response, the judges adopted a standard by which attorneys appearing in civil actions in the court must adhere. Several tenets of that standard bear repeating here:

> (C) A lawyer owes, to opposing counsel, a duty of courtesy and cooperation, the observance of which is necessary for the efficient administration of our system of justice and the respect of the public it serves.
>
> . . . .
>
> (E) Lawyers should treat each other, the opposing party, the court, and members of the court staff with courtesy and civility and conduct themselves in a professional manner at all times.
>
> . . . .
>
> (K) Effective advocacy does not require antagonistic or obnoxious behavior and members of the Bar will adhere to the higher standard of conduct which judges, lawyers, clients, and the public may rightfully expect.

*Id.* at 287–88.    Follow-on litigation, applying *Dondi*, condemned tactics almost identical to those present in this appeal.    For example, the Northern District of Texas explained:

> If opposing counsel's arguments are weak, they are to be challenged on the merits; the arguments can be characterized as wrong or incorrect without referring to them as "garbage" or "legal incompetence" or referring to the attorneys [as] "various incompetents," "inept," or "clunks." Characterizing an attorney or firm as a "puppet" or "stooge" of another adds nothing to a determination of the merits of their arguments.

*In re First City Bancorporation of Tex., Inc.*, 270 B.R. 807, 813 (N.D. Tex. 2001).

Following *Dondi*, lawyers across the country searched for the proper balance of civility and advocacy in the legal profession.    In November 1989, a year after the opinion, the Supreme Court of Texas and the Texas Court of Criminal Appeals issued the "Texas Lawyers' Creed: a Mandate for Professionalism" to eradicate "abusive tactics" that had become "a disservice to our citizens, harmful to clients, and demeaning to our profession."    *See* Eugene A. Cook, *The Search for Professionalism*, 52 TEX. BAR J. 1302, 1303 (1989) (reprinting the Texas Lawyers' Creed).    The Creed demands courtesy, candor, and cooperation in all lawyer-to-lawyer dealings, and prohibits unprofessional conduct in retaliation for other unprofessional conduct.    That same year, three retired chief justices of the Texas Supreme Court founded the Texas Center for Legal Ethics, which promotes the values contained in the Texas Lawyers' Creed.

Following these advancements, we commended Texas's efforts "to instill a greater sense of professionalism among attorneys."    *McLeod, Alexander, Powel & Apffel, P.C.*, 894 F.2d at 1487.    We do so again today.    We

recognize that such unprofessional practices as those that occurred in this case continue to appear in our courtrooms, despite many attempts to eradicate such practices.  We remind all practitioners in our court that zealous advocacy must not be obtained at the expense of incivility.  As Judge Reavley aptly explained, "Although earnest, forceful, and devoted representation is both zealous and proper, Rambo and kamikaze lawyers lead themselves and their clients to zealous extinction."  Reavley, *supra* at 646 (footnote omitted).

IV

For the above reasons, we REVERSE the decision of the district court and REMAND for further proceedings consistent with this opinion.